**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS**

KIMBERLY ASKA )
)
       Plaintiff, )    Case No. 23-cv-50004
)
v. )
)    Judge Johnston
KENNETH YINGLING, et al. )    Magistrate Judge Schneider
)
       Defendants. )

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

This is not a summary judgment case. On January 11, 2022, IDOC Officers Matthew Montemayer and Kenneth Yingling surveilled Plaintiff Kimberly Aska's home at Chamberlain Drive in Dekalb, Illinois, to find a parolee whom they believed was there. As documented on Ms. Aska's home security cameras, Defendants became frustrated with Ms. Aska, and they entered her home without consent. Defendant Yingling first rushed into the home, slammed Ms. Aska against a wall, and grabbed her by her hair. Defendants Yingling and Montemayer then slung Ms. Aska from inside her home, into the air, and on the concrete outside. Defendants grossly exceeded the limits for force, and they did so in a situation where there was no justification for using such force. Ms. Aska was unarmed. She never threatened Defendants or anyone else. She was not violent and did not attack them. She did not run. She never yelled at Defendants or even directed an unkind word at them.

Defendants' disregard for Ms. Aska's rights is palpable. None of the Defendants reported the misconduct to any supervisor, or take any steps to intervene. Making matters worse, they worked to cover up their misconduct and omit that Ms. Aska was brutalized. Instead, they falsely reported that they did this for Ms. Aska's own safety and failed to submit the required use of force report.

Today, Defendants pretend that their conduct was not under the authority of the state in an attempt to avoid Section 1983 liability, even though all other evidence flatly contradicts that contention. Even if Defendants' own facts are credited (which they cannot be at this stage), Defendants' actions under color of state law were plainly excessive. Defendants do not develop any credible argument at summary judgment that they were not acting on behalf of the state.

Ms. Aska brings this suit to hold Defendants accountable and to vindicate her rights. In their motion, Defendants do not even explain *why they went to her home*. Established law and the plain facts unambiguously dictate that Defendants' conduct was under the color of state law, and illegal. Finally, the record establishes more than sufficient grounds for a reasonable jury to conclude that the

constitutional violations at issue were caused by Defendants acting under the color of state law. Defendants' motion should be denied.

## STATEMENT OF MATERIAL FACTS IN DISPUTE

Defendants purport to cite undisputed facts, but they impermissibly cherry-pick from the record, slant facts in their favor, and omit evidence. The facts in their briefs are hotly disputed. This Court examines the evidence in the light most favorable to Plaintiff and draws all inferences in her favor. *Perez v. Thorntons*, 731 F.3d 699, 703 (7th Cir. 2013).

## I. STATE CHIEF ORDERS DEFENDANTS TO APPREHEND PAROLEE

On January 8, 2022, IDOC Chief of Parole, Jason Garnett, received intelligence from his staff that parolee Adam Graham (a non-party) was responsible for transporting drugs being sent into a state prison. PSOF¶12. Two days prior, IDOC's Internal Affairs discovered that a package being sent to a state prison contained sedative drugs, known as barbiturates. *Id.* To determine the source, IDOC listened to inmate phone calls and concluded that Graham was responsible. *Id.*

That same day, Chief Garnett ordered Defendant Montemayer to apprehend Graham ("let's get him off the streets") for transporting the drugs into the state prison. PSOF¶13. He saw no reason to inform the U.S. Marshals because he did not report to them, and was unaware that the U.S. Marshals had "adopted" the case. *Id.* But Defendants were under his supervision, and he ordered them to arrest Graham for transporting drugs as a matter of "high importance". PSOF¶14.[1]

The U.S. Marshals did not know these facts when Defendants brutalized Ms. Aska on January 11, 2022. PSOF¶15. In fact, at the time, the U.S. Marshals did not know a great deal of the facts about the reason Defendants went to Ms. Aska's home that they now focus on in their briefs. ECF 251 at 4

---

[1] Although apprehending an AWOL parolee is the second to lowest priority for IDOC's Fugitive Apprehension Unit, it became a priority when the Chief gave the order. *Id.*

(omitting the facts covering the days before January 11, 2022). Facts that the U.S. Marshals did not know obviously did not inform any U.S. Marshals' Task Force decision to apprehend Graham..

## III.     DEFENDANTS EXECUTE THE STATE'S CHIEF OF PAROLE'S ORDERS.

### A.     Defendants Arrives in Dekalb to Apprehend Graham at Ms. Aska's Home and Detain Her in State Vehicle

On the morning of January 11, 2022, Defendant Montemayer arrived at the Debalk Police Department to lead a briefing of the Graham investigation. PSOF¶23. One U.S. Marshal, Inspector Schulte, arrived to assist. *Id.* But the Inspector was the team leader or supervisor. *Id.* Nor was he in charge. Consequently, Defendant Montemayer led the morning brief and gave out directions. *Id.*

After Montemayer's briefing, Defendants proceeded to Ms. Aska's home. PSOF¶24. Defendant Yingling drove his state-issued vehicle, and Montemayer rode in the passenger seat. *Id.* At approximately 10:30 a.m., Ms. Aska exited her house and left in her car. *Id.* Defendant Yingling turned on the flashing lights of his state vehicle and they detained Ms. Aska. *Id.* Defendants approached Ms. Aska's vehicle and questioned her about Graham. PSOF¶25. Defendant Yingling approached Ms. Aska from her driver's side window, while Montemayer on the passenger side. *Id.* The only actual badge Yingling had on display for Ms. Aska to see was an IDOC badge. *Id.* Defendants did not have any Marshal's badge to display. *Id.* [2]

After questioning Ms. Aska, Defendants placed her in their IDOC vehicle. PSOF¶26. They told her that, if she would not agree to their demands, they would arrest her. *Id.* Without her consent, Defendants drove Ms. Aska back to her house in the state vehicle and confiscated her phone. *Id.* At 12:40pm, Defendant Montemayer sent another IDOC update email regarding Graham. PSOF¶27. He and Yingling both used state issued-emails throughout the Graham investigation, and there is no evidence in the record of them using federally-issued email accounts. *Id.* They had to comply with

---

[2] Montemayer claims that he has a Marshal's badge too, but he doesn't display it. *Id.*

IDOC's policies when using their emails. *Id.* Further, Defendants used state-issued laptops during the incident and were required to follow IDOC usage policies. *Id.* Defendants did not have any federally-issued laptops with them. *Id.*

### B. Defendants Approach Ms. Aska's Home with State Badges and Guns

Defendants continued to use and brandish state equipment. When they approached Ms. Aska's home, they displayed state issued-glock 9mms. PSOF¶28. They also communicated with each other on state issued-cell phones and they were only allowed to conduct state business on these state-issued cell phones. PSOF¶18. Defendants did not use federally-issued cell phones on January 11, 2022. *Id.* Defendants also prominently wore IDOC insignia and badges on their chests. PSOF¶28. Again, the only actual badges Defendants had on display for Ms. Aska were state-issued. *Id.* And Montemayer kept his alleged Marshals credential in his pocket. *Id.*

### D. Defendants Brutalize Ms. Aska and Report Graham's Apprehension to IDOC Supervisors, but Omit Their Misconduct.

As stated above, and as captured on Ms. Aska's home security cameras, Ms. Aska was brutalized. PSOF¶29. Defendant Yingling rushed into the home, slammed Ms. Aska against a wall, and grabbed her by her hair. *Id.* Defendants Yingling and Montemayer then slung Ms. Aska from inside her home, into the air, and on the concrete outside. *Id.* Defendants are expected to prepare written reports and followed all of IDOC's reporting requirements *except* for disclosing the use of force. PSOF¶30. On January 11, 2022, pursuant to IDOC policy, Montemayer reported Graham's arrest to IDOC's Operation Center. *Id.* At 4:04pm, IDOC Operations Center confirmed that Graham was in custody. *Id.* At 7:28pm, IDOC issued an arrest notification for Graham as required by state policy to notify Defendants' supervisors, including Chief Garnett and Commander Ley, that Graham was apprehended. *Id.*

IDOC requires Defendants to report incidents up the chain of command without delay and to update their IDOC Commander in a timely manner when they are performing the duties of the

state. PSOF¶31. On January 12, 2022, Defendant Montemayer and Yingling both updated Commander Ley on Graham's charges and Graham's apprehension. PSOF¶31. On January 24, 2022, Defendant Montemayer completed an IDOC Apprehension Investigation Report, which Defendants are required to prepare at the conclusion of a state investigation PSOF¶32. Ultimately, Defendants carried out Chief Garnett's mandatory directives. *Id.*

### E. Only IDOC Holds Defendants Accountable for Excessive Force

Despite this reporting, Defendants did not disclose to their IDOC supervisors the video that captured the excessive force to the IDOC supervisors. PSOF¶33. In turn, their IDOC supervisors were unaware of the misconduct when they conducted their annual evaluations, where IDOC assesses their ability to constitutionally investigate, apprehend, and arrest IDOC parolees. *Id.* Chief Garnett also evaluates officers' use of force, unless officers fail to report it. *Id.* IDOC evaluates Defendants' performances to hold them accountable for their actions. *Id.*

The U.S. Marshals do not, and have never, conducted an evaluation of Defendant Yingling and Montemayer's performances. PSOF¶34. The U.S. Marsals do not, and have never, imposed any disciplinary procedures on any IDOC officer for misconduct, including Defendants Yingling and Montemayer. *Id.* It makes that only IDOC imposes discipline since IDOC retains responsibility for its officers as the parent agency, and is liable for their actions and omissions. *Id.*

Further, IDOC's training conflicts with that of the Marshals. IDOC has very detailed training requirements for officers who use force. IDOC prohibits excessive force. PSOF¶35. As a result, IDOC requires officers to document use of force. *Id.* They train their agents that they should only use force when it is necessary - only when an officer has no choice but to resort to force to control the subject. *Id.* IDOC's policy is that reasonableness means that the officer must employ the appropriate amount of force required to gain control over the person. *Id.* IDOC trains their parole agents that they must be able to take the information they perceive concerning the resistance or danger caused by

the person and immediately match it with the most proper available means of control. *Id.* The level of force used must not exceed the level considered justifiable. *Id.[3]*

### F. IDOC Pays Defendants During the Time When They Violated Plaintiff's Constitutional Rights

IDOC, as opposed to the task force, paid Defendants Yingling and Montemayer when they violated Plaintiff's constitutional rights. The task force only reimburses IDOC for overtime incurred. PSOF¶39. IDOC Defendants provide their hours to IDOC. *Id.* IDOC then provides an invoice to the task force, and the task force reimburses IDOC for the overtime it has paid to the agent. *Id.* IDOC pays the IDOC officers overtime, and the task force reimburses IDOC. *Id.* Defendants' overtime pay comes with their check from IDOC. *Id.* The check comes from the State of Illinois Comptroller. *Id.*

Defendants work 8.5 hour shifts for the state. PSOF¶40. Only IDOC, not the task force, pays officers during regular shift hours. *Id.* On January 11, 2022, Defendant Yingling's regular shift hours were between 7:00 a.m. and 3:30 p.m. *Id.* The Task Force did not pay him for any hours between 7:00 and 3:30 p.m since those were his regular shift hours. *Id.* Similarly, Defendant Montemayer's shift on January 11, 2022, was between approximately 6:00 a.m. and 2:30 p.m. *Id.* Accordingly, Defendants were not paid for any activities he performed until after 2:30 p.m. *Id.*

### LEGAL STANDARDS

### I. Summary Judgment

Summary judgment is warranted only if Defendants show there is no genuine issue of material fact on any of Plaintiff's claims and that they are entitled to judgment as a matter of law. *Perez*, 731 F.3d at 703. This Court views the evidence in the light most favorable to Plaintiff and draws all inferences in her favor. *Id.* It cannot determine credibility, weigh evidence, resolve fact disputes, or

---

[3] The U.S. Marshals are unfamiliar with IDOC's use of force policies, and whether it conflicts with theirs. PSOF¶36. The only U.S. Marshal on the scene, Michael Schulte, does not agree with these IDOC policies and does not follow them. *Id.* Inspector Schulte also claims that he does not know whether any force at all was used against Plaintiff. *Id.* This is impossible given the fact that he was there with them. *Id.*

choose what inferences to draw. *Anderson v. Liberty Lobby*, 477 U.S. 242, 255 (1986). The Seventh Circuit has said summary judgment is rarely appropriate in excessive force cases because the factual accounts always differ. *See, e.g. Abdullahi v. Madison*, 423 F.3d 763, 773 (7th Cir. 2005); *Cyrus v. Mukwonago*, 624 F.3d 856, 863 (7th Cir. 2010).

## II.     Acting Under the Color of State Law

Color of law is rooted in authority. *DiDonato v. Panatera*, 24 F.4th 1156, 1159 (7th Cir. 2022). "The traditional definition of acting under color of state law requires that the defendant in a § 1983 action have exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" *West v. Atkins*, 487 U.S. 42,49 (1988) (quoting *United States v. Classic*, 313 U.S. 299, 326 (1941)). The central question is whether the conduct is "fairly attributable to the State." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 937 (1982). To determine if it is, the focus is on the "nature of the acts performed by the accused state actor and the circumstances surrounding those acts" when the conduct occurred. *United States v. White*, 68 F. App'x 707, 709 (7th Cir. 2003).

In *Redmond v. City of Rockford*, the court acknowledged multiple factors, including (1) the actual task force agreement; (2) whether officers "participated in a clearly federal investigation or in a federally instigated raid," and (3) whether the officers were subject to federal control. 2024 WL 4953825, at *3 (N.D. Ill. Dec. 2, 2024) (quoting *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 336 (M.D.N.C. 2008). Other factors include (4) compensation structure and (5) whether officers wore federal or state insignia. 2024 WL 4953825, at *3. No factor in isolation is dispositive.

No factor is dispositive for determining whether Defendants acted under color of state law when they violated Plaintiff's rights. *Id.* Rather, all of the circumstances must be examined to consider whether the actions complained of were sufficiently linked to the state. *Askew v. Bloemker*, 548 F.2d 673, 677 (7th Cir. 1976) (considering "the totality of the circumstances" to determine whether law

enforcement officers were acting under color of state law). The totality of the circumstances test was recently affirmed by the U.S. Supreme Court, holding that it includes events leading up to the use of force, without temporal limitations. *Barnes v. Felix*, No. 23-1239, 2025 WL 1401083, at *1 (U.S. May 15, 2025). That analysis demands "careful attention to the facts and circumstances" relating to the incident. *Felix*, 2025 WL 1401083, at *1. Most notably here, the "totality of the circumstances" inquiry has no time limit. *Id.* Prior events may shed light on the officers' conduct, and why force was applied. *Id.*.

Ultimately, when making a determination about whether Defendants acted under color of law, Defendants' word is not final. *Cf. Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (giving the jury the task of figuring out whether there was a "meeting of the minds" in a federal civil-rights action); *Yassin v. Weyker*, 39 F.4th 1086, 1090 (8th Cir. 2022) ("a jury may well need to resolve the factual dispute first, before the district court can decide the color-of-law question"). And, while the "color of state law" question is legal rather than factual, the determination "can turn out to be quite 'fact[]bound,'" including the specific instructions given to defendants. *Id.* (court considers "the specific duties Weyker was given on the task force, and the use of her state uniform and the filing of the incident report").

## III. A TRIAL IS NECESSARY ON PLAINTIFF'S CLAIMS BECAUSE THE TOTALITY OF THE CIRCUMSTANCES DEMONSTRATE DEFENDANTS VIOLATED PLAINTIFF'S RIGHTS UNDER COLOR OF STATE LAW

Though Defendants cite to *Redmond,* they focus exclusively on their preferred factors, namely the control of the day-to-day operations" and what they call "source of authority and legal regime". *See* ECF 251 (Defs' Motion) at 10-13. They also pay lip service in a single paragraph to "other factors". *Id.* at 12. In doing so, Defendants give short shift to *Redmond* factors.[4] By ignoring these factors,

---

[4] (1) the actual task force agreement; (2) whether officers "participated in a clearly federal investigation or in a federally instigated raid," and (3) whether the officers were subject to federal control; (4) compensation structure and (5) whether officers wore federal or state insignia. Supra, at 10.

Defendants have forfeited any real argument for summary judgment, and it will be too late for them to address these other theories in reply. *See Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) ("As the moving party, the [defendant] had the initial burden of identifying the basis for seeking summary judgment.").

### A. The Actual Task Force Agreement Supports State Action

Defendants are deafeningly silent on the important provisions in the first factor mentioned in Redmond: the agreement. This is because the Memorandum of Understanding between the Illinois Department of Corrections and the IDOC cuts against summary judgment, not towards it. The MOU states that IDOC officers who are members of the Task Force must comply with IDOC's use of force policies. PSOF¶37. IDOC retains responsibility for the conduct of its personnel. *Id.* IDOC "shall be responsible for the acts or omissions of its employees". *Id.* IDOC employees shall not be considered as the agency of another participating agency. PSOF¶38. The Task Force Commander was largely unaware of the Task Force Agreement's provisions. PSOF¶37. But their willful ignorance is not Plaintiff's fault. And neither is Defendants' failure to analyze it.

### B. Defendants Participated in a Clearly State-led Investigation

Since this is Defendants' motion for summary judgment, the court must construe the facts and all permissible inferences in Plaintiff's favor. Defendants' version of how the events unfolded is devoid of any mention of Chief Garnett's orders before they brutalized Ms. Aska. Accordingly, Defendants have forfeited any argument along those lines. *Alioto v. Lisbon,* 651 F.3d 715, 721 (7th Cir. 2011) ("Longstanding under our case law is the rule that a person waives an argument by failing to make it[.]"). Any argument they might raise on this point in reply should be disregarded. *Narducci v. Moore,* 572 F.3d 313, 324 (7th Cir. 2009). And the *only* evidence in the summary judgment record for why Defendants decided to go to Plaintiff's home so abruptly on January 11, 2022 is Chief Garnett's orders.

In doing so, they attempt to prevent the Court's consideration of the prior events leading up to Defendants' use of excessive force. *Felix*, 2025 WL 1401083, at *1 ("[a[ court deciding a use-of-force case cannot review the totality of the circumstances if it has put on chronological blinders"). Faced with that reality, Defendants focus on arguments that they hope will change the equation—arguing about why Congress founded task forces, suggest that a special deputation is determinative–pleading that the task force "adopted" the case, and ignore the state's agreement with the task force. ECF 251 at 10-12. Each of these arguments fails too.

As an initial matter, IDOC retains responsibility for all cases it refers to the task force, and maintains responsibility for all their acts or omissions, including the use of force, and failure to intervene, as they did in this case. PSOF¶37. Further, special deputation does not mean they could not act as agents of the state. If that were the case, no plaintiff could ever sue a state officer who had been deputized to serve on a task force. And there were explicit limits: Defendants were specifically not authorized to participate in any drug-related investigations under the special deputation. PSOF¶38.

Defendants decline to address the fact that Chief Garnett ordered them to apprehend Graham for transporting drugs into the state prison. Defendants put a lot of stock into the Task Force's adoption of the case and assigning Graham a federal identification number. ECF 251 at 3-4, 12. Perhaps this would make sense if Chief Garnett's orders to apprehend Graham were connected in any way to the case adoption. But Chief Garnett was completely unaware the task force ever "adopted" the case, and did not care. The only real benefit of the task force adopting the case is to use federal resources, and there is no indication that Defendants actually used anything other than state resources. PSOF¶10. Essentially everything Defendants used to apprehend Graham at Plaintiff's home were state resources: guns, trucks, phones, and emails. PSOF¶¶16-21. At best, next to their official-IDOC badge, they had a velcro patch for the task force, in their pocket, or somewhere Plaintiff could not ever see. More importantly, the Chief does not report to, or answer to anyone from the task force, or

the U.S. Marshals. His directions come from above - there is a hierarchy in the state that flows from the Governor, to the IDOC Direction, to the Chief of Parole to Defendants. PSOF¶¶11. The Chief's orders take priority, and the Defendants knew it. PSOF¶¶13-14.. On the other side of the fence, not a single federal officer knew that Chief Garnett ordered Defendants to apprehend Graham. PSOF¶15. Viewing the record in the light most favorable to Plaintiff, Defendants's challenged conduct occurred under the state's authority.

### C. Defendants Were Subject to State Control

Defendants put forth multiple, disjointed arguments for why their challenged conduct did not take place under state control and supervision. They claim they were actually federal employees/officers, highlight that the federal government gives the task force money, and they were led by Inspector Schulte. ECF 251 at 12-13. None of these arguments has merit.

To begin with, Defendants are not considered federal employees by the U.S. Marshals. PSOF¶38. Defendants also knew they were not federal employees or officers because it was prohibited under the terms of their special deputation PSOF¶38. Further, the MOU states that IDOC employees shall not be considered as the agency of another participating agency. *Id.*

Next, it is unclear what federal resources were actually spent to apprehend Graham. Defendants employed State of Illinois' weapons, trucks, emails, phones, and computers during normal shift hours, using resources supplied by the State. PSOF¶16-21. *See United States v. Causey*, 185 F.3d 407, 443 (5th Cir.1999). Because Defendants' status as state employees enabled them to access these resources, they invoked the powers of the state government to investigate and apprehend Graham. Therefore, however improper Defendants' actions were, they clearly related to the performance of the duties that Chief Garnett had them carry out.

Defendants then celebrate the few, and fabricated, task force reports that were completed. ECF 251 at 13. But that argument cannot carry the day. Defendants did not complete the *required*

reports for federal officers who use force. PSOF¶30. The only justification strains credulity to the breaking point: they did not document the force because there was no force used at all (which is untrue). PSOF¶36. But Defendants reported extensively to their IDOC supervisors, as required by policy. PSOF¶30. They reported everything except the use of force. PSOF¶30.

In an attempt to gain federal cover, Defendants portray Inspector Schulte as "team leader" (ECF 251 at 12), but the Court only needs to look at Schulte's deposition to know the opposite is true. Schulte explains that he was not in charge of Defendants Yingling and Montemayer. He was neither their supervisor nor their team leader. PSOF¶23. He did not provide any instructions when the officers were briefed; only Montemayer did. Since he was not the team leader, he did not know the reason Defendants decided to apprehend Graham so quickly. *Id.* He only knew that Defendant Montemayer was leading the Graham investigation, and came to the IDOC officers. *Id.*

Defendants' fallback position is that *Askew v. Bloemker*, 548 F.2d 673 (7th Cir.1976), precludes § 1983 claims against them. Askew bears little similarity to Plaintiff's case, however, and defendants misconstrue what similarity exists. In *Askew*, a federal agency orchestrated a drug raid, in which some of the agents employed by the federal agency were secondarily employed as state agents. *Id.* at 675. The Seventh Circuit upheld the district court's grant of summary judgment on § 1983 claims for the state defendants, finding that the exclusively federal character of the raid dictated this result. *Id.* at 680. In *Askew*, the Court did not hold that individuals who were members of a federal task force could never act under color of state law. Rather, the Court found that those circumstances (officers who were also federal employees) showed that those particular state employees had not acted under color of state law when the investigation had always been led by the federal government. *Id.* at 675. *Askew* is therefore distinguishable from Aska for at least four reasons.

***First***, the Askew officers were employed on a "full-time basis" by the federal government. 548 F.2d at 677. Here, Defendants remained full-time state employees. PSOF¶38. And they knew that they

were not federal employees. *Id.* Moreover, the task force agreement only allowed them to act as agents of the State. PSOF¶37. **Second**, the *Askew* officers crossed state lines between Missouri and Illinois, which is why they could not have been under color of their state law. *Id.* at 677. In contrast, Montemayer and Yingling's actions took place in Illinois, and their state arrest warrant was executed under state law. PSOF¶3. *See Carr v. Mendrick*, No. 21-CV-6301, 2023 WL 3123291, at *4 (N.D. Ill. Apr. 27, 2023) (distinguishing *Askew* on the same basis); *Davis v. Kelly*, 755 F. Supp. 199, 203 (N.D. Ill. 1990) (same).

**Third**, the *Askew* raid was spawned by a federal investigation. 548 F.2d at 675. In contrast, the Graham investigation resulted from a state investigation of drugs that the federal government was completely unaware of. PSOF¶15. Further, the state's chief, who ordered Defendants to apprehend Graham, was unaware of any federal interest in the case. PSOF¶13. That is because the adoption was semantics. It only allowed the federal government to provide resources, hardly any of which Defendants identify in their motion. That's because Defendants know the obvious - that they went to Plaintiff's home because Chief Garnett ordered them. **Fourth**, the officers in *Askew* met to plan the operation and they were met by the federal agent in charge of the case. *Id.* at 675. Here, Defendant Montemayer was the lead investigator and led the briefing of all officers. The only federal officer, Schulte, did not give directions at the briefing because he was not in charge, and this was not his case. He didn't even know about Chief Garnett's orders. At his deposition, he did not even know who Chief Garnett was.

Also unavailable is Defendants' citation to this Court's decision in *Redmond v. City of Rockford*, to curry favor. 2024 WL 4953825, at *1 (N.D. Ill. Dec. 2, 2024). *Redmond* is just as distinguishable as Askew, which it relies on. In *Redmond*, the Rockford Police Department and the U.S. Drug Agency (DEA) established a joint task force to combat drug trafficking. *Id.* at *3. Under the task force Agreement, the sole officer who was assigned to the task force was under the supervision and control

of the DEA, and carried a federal badge. *Id.* Further, when the incident at issue occurred, the police officer was asked to assist the DEA, and not the other way around. *Id.* * 3 ("The state officers assisted the federal agents").

This case is exactly the opposite of *Redmond*. Defendant Montamyer was leading the investigation, and he was ordered by Chief Garnett. He did not go to Plaintiff's home to assist federal agents. Or the contrary, Inspector Schulte is adamant that he went to assist Defendants. Further, unlike *Redmond*, Defendants violated their special deputation. Defendants were explicitly prohibited from participating in any drug-related investigation, and could not have investigated Graham's transporting drugs as members of the task force. Finally, the evidence tilts toward Plaintiff that Defendants were supervised by Chief Garnett, Commander Ley, and IDOC. They were the only ones who ordered them, and knew why they were going. The fact that Inspector Schulte was there too is insignificant. Unlike *Redmond,* there was no federal agent-in-charge here.[5]

### D. "Other Factors" Demonstrate Defendants Were Acting As State Agents

In a last-ditch effort, Defendants take a "throw the kitchen sink" approach to argue that other factors support them. They first point to ambiguous "credentials and badges" that were not prominently displayed. ECF 251 at 13. According to Defendant Yingling, the only actual badge Defendants had on display for Ms. Aska to see was an IDOC badge. PSOF¶21. Both Yingling and Montemayer wore their IDOC badges on their chests. Yingling wasn't aware of any Marshal's badge. *Id.* At best, Defendant Montemayer claims that he had Marshal's credentials somewhere in his pocket that no one could see. When Defendants went to Plaintiff's home, they also toted state guns, drove state vehicles, and communicated via state phones and sent correspondence via state email addresses. PSOF¶16-21.

---

[5] Defendants also cite several district court and appellate cases without analyzing how they apply to the instant case, aside from the fact that there may have been a task force involved.

14

Finally, they argue that the federal government paid them while they violate Plaintiff's rights. ECF 251 at 13. But the federal government was not allowed to give Defendants Yingling and Montemayer one cent during the time of the violation of Plaintiff's constitutional rights. PSOF¶39-40. Defendants have not done the math.. The task force only reimburses IDOC for overtime incurred, and not for their regular shift. *Id.* On January 11, 2022, Defendants Montemayer and Yingling's IDOC shifts lasted until 2:30 p.m., and 3:30 p.m., respectively. PSOF¶40. Accordingly, Defendants violated her constitutional rights while they were on the state's clock, including when she was brutalized at approximately 1:53pm. Ex. Y (Ring Camera); Ex. Z (Soderstrom Body Camera). Viewing the record in the light most favorable to Plaintiff, Defendants also lose on the "other factors" too.

The foregoing establishes that a jury could find that Defendants acted under state law based on the unequivocal orders of Chief Garnett, rather than their affiliation with the task force. And it will certainly find that they used excessive force, among other constitutional violations. The summary judgment record establishes that Defendants went to Plaintiff's home upon the orders of Chief Garnett, and used force against Ms. Aska to apprehend Graham. The fact that they went to Plaintiff's home following these orders is without room for debate. These arguments must be rejected at summary judgment.

## CONCLUSION

This case is one in which all material facts are disputed, or otherwise cut in favor of Plaintiff. The motion for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

**KIMBERLY ASKA**

By: /s/ Quinn K. Rallins
*One of Plaintiff's Attorneys*

Jon Loevy
Quinn K. Rallins
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor

Chicago, IL 60607
(312) 243-5900
rallins@loevy.com

## CERTIFICATE OF SERVICE

I, Quinn K. Rallins, an attorney, hereby certify that, on May 31, 2025, I filed the foregoing

PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT

MOTION used in the Court's CM/ECF system, which effected service on all counsel of record.

/s/ Quinn K. Rallins
*One of Plaintiff's Attorneys*

Jon Loevy
Quinn K. rallins
LOEVY & LOEVY
311 N. Aberdeen St., 3rd Floor
Chicago, IL 60607
(312) 243-5900
rallins@loevy.com

16