IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| Kimberly Aska,<br><br>      Plaintiff,<br><br>    v.<br><br>Kenneth Yingling *et al.*,<br><br>      Defendants. | Case No.: 23-cv-50004<br><br>Judge Iain D. Johnston |

MEMORANDUM OPINION AND ORDER

Plaintiff Kimberly Aska brought this Section 1983 excessive force action against Defendants Kenneth Yingling and Matthew Montemayer. Defendants moved for summary judgment on one issue: Whether they acted under color of *state* (as opposed to federal) law. Because the answer turns on numerous disputed facts, the Court denies Defendants' Motion.

**Background**[1]

---

[1] Montemayer and Yingling urge the Court to reject many of Aska's additional proposed facts for failing to comply with Local Rule 56.1. *See* dkt. 266-1 at 3–7. A district court has "discretion to require strict compliance with its local rules governing summary judgment." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 527 (7th Cir. 2000). Though Aska departs from L.R. 56.1 on many occasions, those infractions, while frustrating, will be forgiven. So, the Court denies Defendants' request—this time. But going forward, Aska's counsel's firm is on notice that future infractions will result in the Court striking the L.R. 56.1 statement. Violating L.R. 56.1 is a recurring problem with Aska's counsel's firm. *See, e.g., Pursley v. City of Rockford*, No. 18-cv-50040, 2024 U.S. Dist. LEXIS 42015, at *4 (N.D. Ill. Mar. 11, 2024). And the Court already flagged a previous problem with Aska's prior filing of her L.R. 56.1 statement. Dkt. 260. The Court has been more than charitable with Aska's counsel's firm's failure to comply with the rule.

1

On January 11, 2022, at around 7:00 AM, Defendants Yingling and Montmayer met at the Dekalb County Police Station. They were preparing to arrest Plaintiff Kimberly Aska's boyfriend, Adam Graham. Yingling and Montemayer are senior parole agents within the Illinois Department of Corrections (IDOC) Fugitive Apprehension Unit. Dkt. 252 ¶ 3. They are also Special Deputy U.S. Marshal Service (USMS) officers with the Great Lakes Regional Fugitive Task Force (the Task Force). *Id.* ¶ 4. The Task Force "combines the efforts of federal, state, and local law enforcement agencies to locate and apprehend violent fugitives." *Id.* ¶ 6.

Other law enforcement officials[2] also attended the briefing, including Kristen Wadsworth and Todd McCloud. Like Yingling and Montemayer, Wadsworth and McCloud are IDOC Fugitive Apprehension agents who also belong to the Task Force. Dkt. 253-7 (McCloud Dep.) 48:1–19; dkt. 253-7 (Wadsworth Dep.) 17:11–19. Other law enforcement officers were also present, at least some of whom belonged to the Dekalb County Police Department. *See* dkt. 253-7 (Wadsworth Dep.) 35:2–8. One (and only one) federal official also attended the meeting: USMS Senior Inspector Michael Schulte. Dkt. 254 ¶ 23; dkt. 264 ¶ 24 (Defendants not disputing that Schulte was the only purely federal official). Everyone involved belonged to the Great Lakes Task Force. *See* dkt. 252 ¶ 24; dkt. 261 ¶ 24.

At the approximately forty-minute meeting, the law enforcement officers discussed the "plan of action" for the arrest and made assignments. *See* dkt. 253-11 (Yingling Dep.) 105:11–19. Montemayer testified that he was the "lead investigator"

---

[2] The Court uses the neutral "law enforcement officials" to avoid the Parties' characterizations, which assume the officers were either state or federal actors.

in the Graham case, so he delivered the briefing. Dkt. 253-2 (Montemayer Dep.) 130:9–20, 132:16–18; *see also* dkt. 253-11 (Yingling Dep.) (testifying that Montemayer provided an update). Others testified that Schulte gave some instructions at the briefing. *See* dkt. 253-7 (McCloud Dep.) 42:14–15, 48:13–19. Schulte testified that he didn't brief the law enforcement officers at the meeting. Dkt. 253-3 (Schulte Dep.) 82:21–25.

The Parties and witnesses dispute who was the "team leader" on January 11, 2022, Schulte or Montemayer. *Contrast*. dkt. 253-3 (Schulte Dep.) 55:9–14 ("This wasn't my investigation . . . [t]he case was assigned to Matthew Montemayer"); *id.* 99:11–15 ("Yes," Montemayer was leading the investigation) *with* dkt. 253 ¶ 25 ("USMS Inspector Schulte was the team leader."); dkt. 253-4 (Grimaldo Dec.) ¶ 15 ("Schulte was the team leader on January 11, 2022"); dkt. 253-4 (Grimaldo Dep.) 150:23–151:17 (USMS Commander Grimaldo (who wasn't present that day) explaining that "generally speaking" overall tactical operations would fall to Schulte); dkt. 253-7 (Schulte Dep.) 209:1–210:23 ("I guess because I am team leader of the task force, I would have been responsible as a team leader for everyone on scene."). None of Yingling's or Montemayer's IDOC supervisors were present at the briefing or the arrest.

***

Following the meeting, law enforcement officers drove to Aska's home. Yingling and Montemayer, who drove together, used their IDOC vehicle. Dkt. 253-2 (Montemayer Dep.) at 136:7–9. Another officer drove in a USMS vehicle. *See* dkt.

3

253-7 (McCloud Dep.) 47:12–25. On the way, Montemayer and Yingling saw Aska driving away from her home and pulled her over. Dkt. 254 ¶¶ 24–26. Yingling says he told Aska that he was "with the U.S. Marshals Fugitive Task Force." Dkt. 253-11 (Yingling Dep.) 137:10–17; *see also* dkt. 19 (Aska's First Amended Complaint) ¶ 31 ("Defendants Yingling and Montemayor [sic] introduced themselves as U.S. Marshals . . . "). After some questioning, Yingling and Montemayer placed Aska in Yingling's vehicle and drove her back to her home. Dkt. 254 ¶ 26.

Law enforcement officers then approached Aska's home. Schulte gave some instructions. *See* dkt. 253-7 (Wadsworth Dep.) 62:10–16 (Wadsworth saying Schulte told him to enter the home); dkt. 253-2 (Montemayer Dep.) 297:18–24 (Schulte "directed everyone to make sure that we had a perimeter.").

Yingling and Montemayer wore IDOC insignia on their chest and belts. Dkt. 253-11 (Yingling Dep.) 137:10–139:17. They had Task Force patches on their shoulders. *Id.*; dkt. 253-2 (Montemayer Dep.) 144:9–12. Montemayer also had a metal USMS badge "in his pocket." Dkt. 253-2 (Montemayer Dep.) 145:1–3. They carried state-issued weapons. Dkt. 254 ¶ 17. Wadsworth indicated that he wore USMS insignia on his chest and back. Dkt. 253-7 (Wadsworth Dep.) 82:17–24. McCloud testified that he also wore Task Force insignia on his chest and back. Dkt. 253-7 (McCloud Dep.) 79:6–9. It's not clear if Schulte, the only federal officer, wore explicitly federal insignia. Likely Schulte, but possibly a different officer, announced

4

themselves as "U.S. Marshals." *See* dkt. 265-5 (Ring Front Door Camera Video) at 01:19–01:20.[3]

During and after the incident, Montemayer and Yingling updated IDOC officials and later prepared IDOC reports, using IDOC devices. *See* dkt. 254 ¶¶ 30–32; dkt. 264 ¶ 30. Some weeks after the incident, Schulte and Yingling also submitted USMS incident reports. *See* dkt. 253-8. The operation occurred during their normal work hours and the USMS did not pay Montemayer or Yingling overtime for this operation. Dkt. 264 ¶ 40.

\*\*\*

The Parties dispute why Graham was arrested on January 11, 2022, and relatedly, whether the arrest qualified as a "Task Force Operation." All agree that, on November 17, 2021, Graham violated the conditions of his parole, triggering an IDOC arrest warrant. Dkt. 255 ¶¶ 18–19. The next day, IDOC assigned Montemayer the investigation into Graham's whereabouts. *Id.* ¶ 20. Montemayer then referred Graham's case to the USMS Fugitive Task Force for adoption. *Id.*

IDOC and the USMS had a Memorandum of Understanding (MOU).[4] *See* dkt. 253-12. Per the agreement, IDOC can refer cases to the Regional Fugitive Task Force, which joins federal, state, and local resources to apprehend fugitives. *Id.* Cases are

---

[3] Having reviewed the video recording several times, the Court would be remiss if it didn't commend Schulte's professional restraint when a person ran up unannounced from behind the law enforcement officers when they were at Aska's residence. That professional restraint is likely the only reason the person was not shot.

[4] Yingling and Montemayer repeatedly assert that this MOU governed the arrest on January 11, 2022. But, as discussed more below, it's relevant to the extent the arrest constituted a Task Force operation. If, as Aska argues, this was an IDOC operation, then it's not clear the MOU's terms apply.

"adopted" by the Task Force's Chief Inspector. *Id.* Adopted cases are given a federal ID number. *Id.* "Direction and coordination of the RFTF shall be the responsibility of the [Chief Inspector]," but "each agency retains responsibility for the conduct of its personnel." *Id.* All Task Force members "comply with their agencies' guidelines" concerning use of force. *Id.* Each participating agency assigns personnel to the Task Force, who are then "deputized as Special Deputy U.S. Marshals." *Id.* Under certain qualifying situations, the USMS reimburses state and local agencies for overtime expenses. *Id.*

On November 22, 2021, the USMS Task Force adopted Graham's case and assigned it a federal number. Dkt. 255 ¶ 22. One USMS official testified that once adoption occurs, the USMS "assumes responsibility for the apprehension of that fugitive," and "it becomes a federal operation," and stays with the USMS until the fugitive is returned. Dkt. 253-4 (Grimaldo Dec.) at 206 ¶ 10. The IDOC Chief of Parole, Jason Garnett, testified that "if it's an apprehension arrest, and the case has been adopted by the U.S. Marshals, IDOC has no control over that case." Dkt. 253-9 (Garnett Dep.) 32:10–14.

A month later, on December 20, 2021, Montemayer contacted Yingling to confirm that Graham was residing at Aska's home. Dkt. 254 ¶ 7. This was either Graham's only known location or one of very few. *Id.*; dkt. 264 ¶ 7 (Defendants disputing that Aska's residence was the *only* known location). Yet, no formal arrest operation like the one in this case occurred until January 11, 2022. *Id.*; dkt. 264 ¶ 7 (Defendants disputing that "no attempt" was made to arrest Graham, highlighting

6

investigative efforts).⁵ Montemayer testified that "[w]e physically went to different locations to try to locate [Graham]," but he couldn't recall those locations. Dkt. 253-2 (Montemayer Dep.) 121:21–122:1.

On January 8, 2022, IDOC Chief Garnett received intelligence that Graham could be responsible for transporting drugs into an IDOC facility.⁶ Dkt. 253-9 (Garnett Dep.) 45:21–24; Def. Ex. P. That same day, Garnett told Montemayer to apprehend Graham, saying "let's get him off the streets." *Id.* ¶ 13. Garnett was not aware that the Task Force had adopted the case; he instructed Montemayer because he was the agent assigned to the investigation. Dkt. 253-9 (Garnett Dep.) 51:25–52:3. Montemayer then texted other team members, including Schulte and other Task Force Members, for help with the arrest.

Aska says Graham was arrested on January 11, 2023, because he was sending drugs into an IDOC facility. Montemayer and Yingling say it was a Task Force operation, intended to arrest a known fugitive.

**Analysis**

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable

---

⁵ The Court overrules Defendants materiality and argumentative objections. *See* dkt. 264 ¶ 7. If it's true that Montemayer knew Aska's precise location but didn't apprehend him, it makes it at least somewhat more likely that the arrest didn't stem from his fugitive status alone.

⁶ Defendants' objection on hearsay grounds is overruled because the statement is not being offered for its truth, only to establish a possible explanation for why the arrest occurred on January 11th. The statement goes to course of conduct, not the truth of the matter asserted.

jury could return a verdict for the nonmovant, construing the evidence and all reasonable inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–49 (1986); *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008).

Section 1983 allows litigants to sue officials for constitutional violations committed under color of state law. 42 U.S.C. § 1983. But, as this Court noted last year, the statute only opens the doors for claims against state agents, not federal ones. *See Redmond v. City of Rockford*, No. 22-cv-50040, 2024 U.S. Dist. LEXIS 217315, at *7 (N.D. Ill. Dec. 2, 2024) (citing *Slabon v. Berryhill*, 751 F. App'x 928, 930 (7th Cir. 2019)); *District of Columbia v. Carter*, 409 U.S. 418, 424–25 (1973).

In its *Redmond* decision, this Court further discussed the analytical complications that arise when state officials serve on federal task forces. As the Court explained, the Seventh Circuit had ruled long ago that, under certain circumstances, a state officer executing an operation with a federal task force is treated as a federal officer for Section 1983 purposes. *See Askew v. Bloemker*, 548 F.2d 673 (1976); *see also Village of Glen Ellyn,* 2017 U.S. Dist. LEXIS 73321, at *8 fn. 1 (collecting cases).

But neither this Court nor *Askew* held that the mere existence of a federal task—without demonstrating a task force *operation*—short-circuits the Section 1983 analysis. To the contrary, a court must "examin[e] the 'totality of the circumstances'" to determine whether the operation at issue had an "indelibly federal hue." *Redmond* No. 22-cv-50040, 2024 U.S. Dist. LEXIS 217315, at *6 (*citing Askew*, 548 F.2d at 677).

8

The Court highlighted various factors that courts, including *Askew*, consider in discerning the operation's character. For example, courts consider whether officers "participated in a clearly federal investigation or in a federally instigated raid." *Pettiford v. City of Greensboro*, 556 F. Supp. 2d 512, 535–37 (M.D.N.C. 2008). They'll also consider whether: cross-deputization agreements existed; state officers received federal reimbursement; the state officers wore federal insignia during the operation at issue. "No factor in isolation is dispositive." At all times, the central inquiry is whether action should be attributed to the state or federal government. No Parties focus on the universe of relevant factors, so the Court assumes those aren't in dispute. *See* Dkt. 266-1 at 7 (Defendants correctly observing that "[t]his Court is well familiar with the legal framework used to decide the color of law question . . . so it is only summarized here for context.").

\*\*\*

The Court finds one dispositive (and disputed) factual issue in this case: Why did the law enforcement officers arrest Graham on January 11, 2022? If, as Yingling and Montemayer contend, the officers intended to find and apprehend a fugitive per the MOU, then the arrest would qualify as a "clearly federal investigation or . . . . federally instigated raid." *Pettiford*, 556 F. Supp. 2d at 536. And that federal operation should then be attributed to the federal government for Section 1983 purposes. On the other hand, if, as Aska argues, the IDOC sought to eliminate drug distribution in its jails, then that state mission would predominate over the limited federal involvement.

9

Some undisputed evidence supports the conclusion that Montemayer and Yingling acted as federal Task Force officers executing a fugitive warrant. For example: The state-entity IDOC was a party to the Fugitive Task Force MOU. Aska's boyfriend was a fugitive who was assigned a federal ID number. Montemayer, Yingling, and other state officers were cross-deputized federal agents. A federal USMS officer (Schulte) participated in Graham's arrest. Officers completed federal paperwork after the incident.[7]

As a legal matter, however, those undisputed facts don't resolve the question, failing to cast an "indelibly federal hue" on the operation. That's especially true when other indications point in a state direction. Yingling and Montemayer cite many cases holding that federal task forces act under color of federal law for Section 1983 purposes. This Court doesn't disagree. But without establishing the predicate fact that this arrest qualified as a Task Force operation, those cases aren't helpful.

Defendants are correct that *if this were a "Task Force operation,"* then the officers' state uniform or mode of transportation would play negligible roles. What's more, everyone agrees that *if this were a "Task Force operation,"* then the MOU's terms would apply, Schulte would assume responsibility, and the federal government could foot the bill. But Defendants' arguments fail because they too quickly assume that predicate fact, summarily concluding that officers aimed to arrest a fugitive not an IDOC suspect. Without making that initial showing, the federal indicia are, in the light most favorable to the nonmoving party, coincidental.

---

[7] It's also undisputed, however, that Defendants did not receive federal overtime pay and that they also completed IDOC paperwork.

To be sure, Montemayer and Yingling also identify other facts that, if true, would bolster—perhaps even establish—their argument that they acted as Task Force agents, not IDOC officials. But essentially all those relevant facts are genuinely disputed, such as: Why did it take weeks to arrest Graham? Who led the operation, Schulte or Montmayer?[8] Who gave out assignments? What exactly were the officers wearing? How did they identify themselves? Did they communicate with IDOC officials during the arrest?

Though the Court understands why Montemayer and Yingling rely on *Redmond*, it ultimately finds that case dissimilar to this one. In that case, all agreed that a DEA task force, involving at least seven federal DEA agents, trailed a drug trafficking suspect from Chicago to Rockford, IL. *See Redmond*, No. 22-cv-50040, 2024 U.S. Dist. LEXIS 217315, at *1. And all agreed that a Chicago DEA supervisor "directed the investigation and supervised the team." *Id.* In other words, no party disputed who was in charge or why the operation occurred. That case presented a paradigmatic legal question: Whether state officers who indisputably acted on a federal task force engaged in a federal operation are shielded from Section 1983. Because the Parties spar over the threshold factual questions, *Redmond* isn't helpful. As Justice Jackson recently observed, "[o]ther cases presenting different allegations

---

[8] Defendants say this isn't "genuine[ly] dispute[d]," because later in his deposition Schulte reframed his answer, saying "I guess" I would have been responsible. *See* dkt. 266-1 at 15. Defendants also cite other witnesses who testified that the USMS Chief leads the Task Force operations. Putting aside the contradictory testimony, however, that evidence only helps once it's established that this was a Task Force operation. Defendants therefore advance a circular argument—essentially, it was a Task Force operation because Schulte was in charge; and Schulte was in charge because it was a Task Force operation.

11

and different records may lead to different conclusions." *Twitter, Inc. v. Taamneh*, 598 U.S. 471, 507 (2023) (Jackson, J., concurring).

***

So, the issue becomes who resolves that factual dispute, *i.e.* who decides why officers arrested Graham on January 11th? Montemayer and Yingling say the Court should resolve it. Aska says a jury must decide.

The question of whether a public official acts under color of federal law, rather than state law, is a question of law. *See Yassin v. Weyker*, 39 F.4th 1086, 1089 (8th Cir. 2022) (citing *Cuyler v. Sullivan*, 446 U.S. 335, 342 n.6 (1980)); *Redmond*, No. 22-cv-50040, 2024 U.S. Dist. LEXIS 217315, at *7. But as this case well illustrates and Aska argues, "the under-color-of-law determination can be quite 'fact [ ] bound'" *Yassin*, 39 F. 4th at 1090 (citing *Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 939 (1982)). In such scenarios, "juries still have a role to play when material facts are in dispute." *Id.* "[A] jury may well need to resolve the factual dispute first, before the district court can decide the color-of-law question." *Id.*

The Seventh Circuit recognized the same a few decades ago, observing that even in Section 1983 state action questions, "the facts . . . may have to go before a jury." *Pickrel v. City of Springfield, Ill.*, 45 F.3d 1115, 1119 (7th Cir. 1995); *see also Gibson v. City of Chicago*, 910 F.2d 1510, 1517 (7th Cir. 1990). In *Pickrel*, a plaintiff brought a Section 1983 claim against a police officer who was also employed as a private security guard. 45 F.3d 1115 (7th Cir. 1995). The district court granted the officer's motion to dismiss, reasoning that the officer didn't act under color of state

12

law. *Id.* at 1117. The Seventh Circuit reversed. *Id.* Highlighting a string of factual issues similar to this case, like the officer's clothing, badge, and behavior, the Seventh Circuit concluded that the plaintiff might prove that the officer acted under color of state law. *Id.* at 1119.

Other circuits agree. In *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, the Eleventh Circuit reversed a grant of summary judgment on a Section 1983 claim, finding that the plaintiff demonstrated a genuine factual issue regarding state action. 344 F.3d 1263, 1276 (11th Cir. 2003); *see also Layne v. Sampley*, 627 F.2d 12, 13 (6th Cir. 1980) ("Although in certain cases, it is possible to determine the question whether a person acted under color of state law as a matter of law, there may remain in some instances unanswered questions of fact regarding the proper characterization of the actions for the jury to decide.") (citation modified).

And if those cases don't compel a jury trial in this case, nothing in them prohibits one. Under Federal Rule of Civil Procedure 49, a court may submit specific factual questions to the jury. As the Eight Circuit explained in a FLSA case, "[w]hile the precise nature of the working relationship—as examined by means of the factors—involves questions of fact, the ultimate question of whether or not an individual is an 'employee' within the meaning of the FLSA is a legal determination rather than a factual one. In practice, disputed factual issues that may affect this legal determination can be submitted to the jury as special jury questions." *Walsh v. Alpha & Omega USA, Inc.*, 39 F.4th 1078, 1082 (8th Cir. 2022) (citation modified). So too in this case.

The Parties each provide strong factual support for their conflicting positions. Without evaluating the witnesses' credibility, however, the Court can't resolve these disputes. How, for example, should the Court decide whether Schulte gave assignments at (and therefore likely led) the pre-arrest briefing, when Yingling and Montemayer say he did but Schulte says he didn't? Or what should the Court make of IDOC Chief Garret's testimony that, once adopted, the IDOC has no role in apprehension, when he didn't know of the federal adoption in the first place? Why did it take approximately seven weeks to arrest Graham, if officers had a good idea about his location, and why did it occur so soon after the drug trafficking inquiry? At this stage, the Court must draw reasonable inferences in *Aska's* favor. That doesn't bode well for Defendants.

The Court believes that settled precedent commands it to send the factual dispute—why was Graham arrested on January 11th?—to the jury. The Defendants didn't carry their burden to establish that no genuine disputes of material facts exist, so the Court can't grant their Motion.

**Conclusion**

For the reasons above, the Court denies the Defendants' Motion [251] for summary judgment.

Entered: July 7, 2025            By: _____
                                     Iain D. Johnston
                                     U.S. District Judge

14