UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| KIMBERLY ASKA, | ) | No. 23 C 50004 |
| Plaintiff, | ) | |
| | ) | Judge Johnston |
| v. | ) | |
| | ) | Magistrate Judge Schneider |
| KENNETH YINGLING, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFF'S RESPONSE TO DEFENDANTS MONTEMAYER AND YINGLING'S
STATEMENT OF MATERIAL UNDISPUTED FACTS
IN SUPPORT OF SUMMARY JUDGMENT**

Plaintiff Kimberly Aska, by her attorneys, Loevy & Loevy, and pursuant to Fed. R. Civ. P. 56 and Local Rule 56.1(b)(2), hereby submits the following response to Defendants' statement of material undisputed facts in support of their motion for summary judgment.

**I. THE CLAIMS AND PARTIES**

1. Plaintiff Kimberly Aska (Aska) seeks to hold defendants Yingling and Montemayer liable for injuries she allegedly sustained on January 11, 2022, during the course of a law enforcement operation to apprehend fugitive parolee Adam Graham (Graham), Aska's boyfriend, who was living at her residence located in Dekalb, Illinois. Dkt. 211 (Second Amended Complaint); Ex. A (Aska Dep.), p. 47-48, 52-56, 63, 66-68, 72; Ex. G (1/12/24 Grimaldo Dec.), ¶¶ 12-14, 19; Ex. B (Montemayer Dep.), p. 111.

**RESPONSE:** Disputed in part. In denying Defendants' motion for summary judgment, this Court determined that "whether they acted under color of state (as opposed to federal) law" is a question that "turns on numerous disputed facts". ECF 269 (7.7.25 Opinion and Order) at 1. Plaintiff seeks to hold Defendants Yingling and Montemayer accountable for violating her constitutional rights based on the orders given by IDOC's Chief of Parole, instructing them to apprehend Graham. ECF 211¶¶18, 25, 80 (Second Amended Complaint). PSOF¶5. Also disputed to the extent that Defendants suggest that Plaintiff did not sustain severe injuries ECF 211¶56.

2. Aska's Second Amended Complaint alleges five counts against Yingling and Montemayer pursuant to 42 U.S.C. §1983: (i) a Fourth Amendment excessive force claim (Count I); (ii) a failure to intervene claim (Count II); (iii) a Fourth and Fourteenth Amendment deprivation of liberty claim (Count III); (iv) a Fourth Amendment unlawful search claim (Count IV); and (v) a conspiracy to violate Aska's constitutional rights claim (Count V). Dkt. 211.

**RESPONSE:** Undisputed.

3. Yingling and Montemayer are senior parole agents with the Illinois Department of

1

Corrections' (IDOC) Fugitive Apprehension Unit. Ex. B (Montemayer Dep.), p. 30, 32; Ex. T (Yingling Dep.), p. 52-53. They are also Special Deputy U.S. Marshal Service Task Force Officers authorized to serve as federal officers with the United States Marshal's Great Lakes Regional Fugitive Task Force. Ex. B (Montemayer Dep.), p. 33-34; Ex. T (Yingling Dep.), p. 66; Ex. I (Montemayer Oath of Office); Ex. L (Yingling Oath of Office).

**RESPONSE:** Undisputed.

## II. FUGITIVE PAROLEE ADAM GRAHAM

4. On or about November 17, 2021, Graham, who was on parole with IDOC after being convicted of two counts of aggravated sexual assault and one count of robbery, cut off his GPS ankle monitor, in Aska's presence. Ex. A (Aska Dep.), p. 55-56, 71-72, 163, 179; Ex. C (Schulte Dec.), ¶5; Ex. S (Search Warrant Affidavit (hereafter "Affidavit")), ¶¶ 3-4, 18; Ex. B (Montemayer Dep.), p. 116, 280-281; Ex. WW (Graham Dep.), p. 14-18, 21-24, 40, 42, 98. Aska and Graham recorded Graham cutting off his GPS ankle monitor. Ex. A (Aska Dep.), p. 164.

**RESPONSE**: Undisputed

5. On the same day, IDOC issued a "cut and run" parole violation arrest warrant for fugitive parolee Graham after he had gone AWOL. Ex. C (Schulte Dec.), 6; Ex. S (Affidavit), ¶5.

**RESPONSE**: Undisputed.

6. From November 2021 until his arrest on January 11, 2022, Graham dated and resided at Aska's residence at 210 Chamberlain Drive, Dekalb, Illinois. Ex. A (Aska Dep.), p. 52-53, 72; Ex. WW (Graham Dep.), p. 33, 40; Ex. WW (Graham Dep.), p. 24, 56-60, 62, 64, 130. While Graham lived with her, Aska knew that Graham was avoiding arrest as a fugitive. Ex. A (Aska Dep.), p. 56-57.

**RESPONSE:** Undisputed.

7. On the night of January 10, 2022, Graham slept at Aska's residence. Ex. A (Aska Dep.), p. 78; Ex. WW (Graham Dep.), p. 64-65. That night, Aska and Graham used cocaine. Ex. A (Aska Dep.), p. 246.

**RESPONSE:** Undisputed.

## III. JANUARY 11, 2022 OPERATION TO LOCATE & APPREHEND GRAHAM

8. On January 11, 2022, law enforcement officers including, among others, Montemayer, Yingling, Todd McCloud (McCloud), and USMS Senior Inspector Michael Schulte (Schulte) participated in an operation to locate and apprehend fugitive parolee Graham. Ex. C (Schulte Dec.), ¶ 9; Ex. F (8/7/23 Grimaldo Dec.), ¶¶ 7-8, 11; Ex. G (1/12/24 Grimaldo Dec.), ¶ 14.

**RESPONSE**: Disputed to the extent Defendants are referring to any federal task force "operation". In denying Defendants' motion for summary judgment, this Court determined that "whether they acted under color of state (as opposed to federal) law" is a question that turns on numerous disputed facts". Dkt. 269 at 1. IDOC's chief of parole ordered Defendant Montemayer to coordinate the apprehension of Graham for transporting drugs into a state facility. PSOF¶5. He ordered Montemayer because IDOC assigned him as the lead investigator on the case. ECF 279-20 at 100:19-21 (Yingling Dep.).

2

### A. Briefing at the Dekalb Police Department

9. On the morning of January 11, 2022, Schulte, Montemayer, Yingling, McCloud, among others, met at the Dekalb Police Department for an enforcement action briefing on the forthcoming operation to locate and arrest fugitive Graham. Ex. C (Schulte Dec.), ¶10; Ex. B (Montemayer Dep.), p. 130; Ex. J (Wadsworth Dep.), p. 29, 35; Ex. K (McCloud Dep.), p. 42; Ex. T (Yingling Dep.), p. 99, 113-114.

**RESPONSE:** Disputed to the extent Defendants are referring to any federal task force "operation". In denying Defendants' motion for summary judgment, this Court determined that "whether they acted under color of state (as opposed to federal) law" is a question that turns on numerous disputed facts". ECF 269 (7.7.25 Opinion and Order) at 1.

10. At the morning briefing, the officers reviewed and discussed information in a written enforcement action briefing document (Enforcement Action Briefing), which they received prior to the meeting. Ex. K (McCloud Dep.), p. 44, 71-72; Ex. D (Schulte Dep.), p. 148-149, 208; Ex. B (Montemayer Dep.), p. 284-286; Ex. R (Enforcement Action Briefing). The Enforcement Action Briefing included, among other things, a recent photograph of parolee Graham and a physical description of Graham, including his height and weight. Ex. R (Enforcement Action Briefing), p. 1 (describing Graham as being 6'4" and 240 pounds); Ex. B (Montemayer Dep.) p. 283-284.

**RESPONSE:** Undisputed.

11. At the briefing, the officers also discussed possible Dekalb locations where Graham was likely hiding, including Aska's residence. Ex. B (Montemayer Dep.), p. 130-131.

**RESPONSE:** Disputed in part. The cited evidence does not contain information that Graham was "hiding." On November 12, 2021, Graham called IDOC to request a transfer of his parole residence to Plaintiff's home, and provided them with her address on Chamberlain Drive in Dekalb, Illinois. ECF 279-15 (Sandoval Report, per Montemayer). Graham was not hiding. Defendant Montemayer, the lead investigator, continuously doubted Graham was residing at Aska's home. PSOF¶3. Defendant Montemayer did not attempt to arrest Graham until January 11, 2022, after the state's chief of parole ordered them to find Graham for transporting drugs into a state prison. ECF 279-2 (Montemayer Dep.) at 128:2-8 ("only on the 11th"); PSOF¶5. As the lead investigator, Montemayer is unaware of a single investigative step taken prior to January 11, 2022, to apprehend Graham. ECF 279-2 (Montemayer Dep.) at 126:20-127:2 ("I–I don't know").

12. Defendant Montemayer believed that Graham was living with Aska based upon his review of law enforcement databases, public aid financial transactions made by Graham in the Dekalb area in November and December 2021, Graham's and Aska's prior requests to allow Graham to reside at Aska's residence (requests which were denied), and social media posts. Ex. B (Montemayer Dep.), p. 101-103, 116-121, 281-282, 296-297; Ex. XX (Graham Public Aid Trans. History); Ex. A (Aska Dep.), p. 55, 58; Ex. S (Affidavit), 5; Ex. C (Schulte Dec.), 4; Ex. D (Schulte Dep.), p. 77-79, 164-165; Ex. O (Montemayer Report), p. 1; Ex. A (Aska Dep.), p. 179.

**RESPONSE:** Disputed. After Defendant Montemayer reviewed law enforcement databases, public aid transactions, social media posts, and received Graham's request to stay with Ms. Aska, he did not believe Graham was residing at Aska's home. PSOF¶3. ("Not everyone goes exactly where they're telling us they want to go"); *id.* ("[Aska's residence] wouldn't be our first stop always"). This Court acknowledged this dispute in denying Defendants' motion for summary judgment. ECF 269 at 14 ("Why did it take approximately seven weeks to arrest Graham, if officers had a good idea about his location…? At this stage, the Court must draw reasonable inferences in Aska's favor. That doesn't

bode well for Defendants.")

13. At this meeting, the officers also discussed known safety considerations, such as: (i) Graham would likely be armed; (ii) Graham's history of mental health issues (bipolar disorder and schizoaffective disorder); (iii) Graham being a known drug user; (iv) Graham's history of being a violent sex offender; and (v) Aska and her children possibly being present in the residence. Ex. C (Schulte Dec.), ¶10; Ex. B (Montemayer Dep.), p. 130-131, 284-286; Ex. T (Yingling Dep.), p. 105; *see also* Ex. R (Enforcement Action Briefing).

**RESPONSE:** Disputed. Defendants cite Schulte's October 9, 2024 declaration, where he proclaims to identify topics that were discussed at the briefing before Aska was assaulted. ECF 279-3 at 3 (Schulte 10.9.24 Decl). But the next day, on October 10, 2024, Schulte conceded he did not actually recall anything discussed during the briefing. ECF 279-4 at 84:19-24 (Schulte Dep.) ("Again, I don't recall what was said at the briefing') ; *id.* at 84:25-85:7 ("I don't recall what was actually communicated that morning"). Schulte's declaration was not based on what actually happened, but information he apparently learned to believe after-the-fact. *Id.* at 85:8-12 ("correct").

Further, the cited exhibit to Yingling's deposition makes no mention of any pre-discussion of Graham being armed, having a history of mental health issues, being a known drug user, or Aska and her children possibly being present in the residence. ECF 279-20 at 105:11-19 (Yingling Dep.). Finally, the cited exhibit to Montemayer's deposition initially made no mention of Graham's mental health issues, drug use, and never mentioned her children possibly being inside the residence, ECF 279-2 at 131:5-10 (Montemayer Dep.) .[1]

14. The officers also discussed a tactical plan for the apprehension of Graham. Ex. C (Schulte Dec.), 11; Ex. B (Montemayer Dep.), p. 285. The tactical plan contemplated how officers would make contact with Graham at the residence and how law enforcement would apprehend Graham as efficiently as possible, while minimizing any risk to Graham, law enforcement, and third parties. Ex. C (Schulte Dec.), ¶ 11.

**RESPONSE:** Disputed that officers discussed a tactical plan to apprehend Graham efficiently, or minimize any risk to third parties, such as Ms. Aska. Defendants cite Schulte's declaration provided to Plaintiff on October 9, 2024 (the evening before his deposition), where Schulte proclaims a tactical plan was discussed to minimize risk to Graham and third parties. ECF 279-3 (Schulte 10.9.24 Decl) at 3. Although Montemayer suggests that Schulte provided a tactical plan at the briefing, Schulte explains that he did not. ECF 279-2 (Montemamyer Dep) at 258:19-22 ; ECF 279-4 (Schulte Dep.) at 21:25. In denying summary judgment, this Court raised this red flag ECF 269 (7.7.25 Opinion and Order) at 14 (7.7.25 Opinion and Order) ("How, for example, should the Court decide whether Schulte gave assignments at (and therefore likely led) the pre-arrest briefing, when Yingling and Montemayer say he did but Schulte says he didn't?")

Further, during his actual deposition, Schulte admitted to the opposite of his declaration: he does not know what was discussed at briefing. ECF 279-4 (Schulte Dep.) at 84:19-24 ("Again, I don't recall what was said at the briefing') ; *id.* at 84:25-85:7 ("I don't recall what was actually communicated that morning").

---

[1] After Montemayer stated that he did not recall any other information being discussed at the briefing, Montemayer's lawyers fed him information on cross-examination. ECF 279-2 (Montemayer Dep.) at 134:18-21; 284:4-285:1.

4

### B. Law Enforcement Positively Identifies Graham Exiting and Re-Entering Aska's Residence

15. On January 11, 2022, the officers left the Dekalb Police Department, travelled to Aska's residence, and established surveillance on her residence. Ex. C (Schulte Dec.), 15; Ex. M (Schulte Report), p. 1; Ex. B (Montemayer Dep.), p. 134.

**RESPONSE:** Undisputed.

16. While conducting surveillance, McCloud observed a white male, later identified as Bryan Malone (Malone), Aska's cousin, working on a vehicle outside of Aska's residence. Ex. K (McCloud Dep.), p. 50-51.

**RESPONSE:** Undisputed.

17. Shortly thereafter, McCloud positively identified Graham, after Graham exited Aska's residence and approached the vehicle Malone had been working on. Ex. S (Affidavit), ¶8 ("McCloud, while on surveillance…observed a male which matched the physical description of Adam Graham…"); Ex. K (McCloud Dep.), p. 55, 74; Ex. B (Montemayer Dep.), p. 103, 137-138.

**RESPONSE:** Disputed in part. Defendants Yingling and Montemayer did not know whether McCloud could positively identify Graham. At best, Montemayer believed that an individual matching Graham's description exited Aska's home. ECF 279-15 (Sandoval Report (per Montemayer)); ECF 279-20 (Yingling Dep.) at 117:21-118:6) (they spotted an "individual that was believed to be Graham"). But since officers were uncertain Graham was the person, they did not apprehend him even though he apparently remained outside for *approximately 5 minutes. Id.* When Montemayer and Yingling stopped Aska's vehicle, they remained uncertain whether Graham was actually in the house. ECF 279-20 (Yingling Dep.) at 149:4-6 ("we were trying to gain the knowledge… that [Graham] was there"). Later, as they forced their way into Ms. Aska's home, they interrogated her to find out whether Graham was in the house. Ex. D (Inside Video) at 00:05-00:21 secs ("You should know whether he's here or not!!"). Since Ms. Aska had just woken up, and did not know whether Graham was in the house either, Montemayer and Yingling threatened to send her to prison. PSOF¶13.

18. McCloud drove past Aska's residence and made eye contact with Graham, who stood off the curb, on the street directly in front of Aska's residence. Ex. K (McCloud Dep.), p. 57, 74, 88; Ex. B. (Montemayer Dep.), p. 103, 138.

**RESPONSE:** Disputed that Graham "made eye contact" with McCloud while he was standing on a curb, and in the street. Graham was not standing on the curb in the cold, but inspecting the battery of Ms. Aska's car. ECF 279-49 (Graham Dep.) at 66:14-24. Further, Graham did not see any officer drive by and make eye contact with anyone while he was outside inspecting the car. ECF 279-49 (Graham Dep.) at 69:11-14. Further, McCloud was unable to identify the person fixing the car – that is, Graham. ECF 279-11 at 51:13-16 (McCloud Dep.) ("I never did, no'). McCloud is uncertain who was outside at different intervals and who was working on the car, including Graham. ECF 279-11 at 51:13-16 (McCloud Dep.) ("I never did, no'); 52:1-3 ("I don't recall); 52:14-17 ("I can't remember").

19. After Graham made eye contact with McCloud, Graham went back inside the residence. Ex. K (McCloud Dep.), p. 56, 74-75; *see also* Ex. E (Abonce Body Cam) at 29:21- 29:35 (Once back in the residence, Graham reported to Aska that somebody drove by the house and "looked at him funny.").

**RESPONSE:** Disputed that Graham "made eye contact" with McCloud and that Graham

went back inside. Graham did not make eye contact with anyone while he was outside inspecting the car. ECF 279-49 (Graham Dep.) at 69:11-14. Further, McCloud is uncertain who was outside at different intervals and who was working on the car, including Graham. ECF 279-11 at 51:13-16 (McCloud Dep.) ("I never did, no'); 52:1-3 ("I don't recall); 52:14-17 ("I can't remember").

20. McCloud communicated his observations and positive identification of Graham to the other officers, including Yingling and Montemayer, via radio. Ex. B (Montemayer Dep.), p. 103, 137-138, 293; Ex. T (Yingling Dep.), p. 117-118, 143-144.

**RESPONSE:** Disputed that McCloud communicated a positive identification of Graham Graham to officers, including Yingling and Montemayer. At best, McCloud observed "someone fitting Graham's description" leaving Ms. Aska's home. Ex. 279-19 (Paul 1.11.22 Affidavit). Further, McCloud claims that he made eye contact with Graham, but Graham did not see any officer drive by and make eye contact with anyone while he was outside inspecting the car. ECF 279-49 at 69:11-14 (Graham Dep.). Further, McCloud was unable to identify Graham, the person who was fixing Ms. Aska's car. ECF 279-11 at 51: 13-16 (McCloud Dep.) ("I never did, no'). McCloud is uncertain who was outside at different intervals and who was working on the car, including Graham. ECF 279-11 at 51: 13-16 (McCloud Dep.) ("I never did, no'); 52:1-3 ("I don't recall); 52:14-17 ("I can't remember").

21. Thereafter, at approximately 1:30 pm, Aska and Malone exited Aska's residence, entered a red Pontiac sedan, and drove away. Ex. A (Aska Dep.), p. 87 (testifying that she left her residence at about 1:30 pm); Ex. K (McCloud Dep.), p. 54; Ex. S (Affidavit), ¶9; Ex. M (Schulte Report), p. 1.

**RESPONSE:** Undisputed.

22. At that point, Schulte directed certain officers to set up a perimeter around the house to ensure that Graham did not leave the residence. Ex. B (Montemayer Dep.), p. 297-298. After law enforcement made a perimeter, no one reported anyone else exiting the residence. *Id.*; Ex. M (Schulte Report), p. 1.

**RESPONSE:** Undisputed.

### C. Defendants' Investigatory Traffic Stop of Aska, Aska Lies to Protect Graham, and Aska Consents to Allow Officers Entry into her Residence

23. Shortly after Aska and Malone left the residence, Defendants Yingling and Montemayer conducted an investigative traffic stop of the Pontiac approximately two blocks away from Aska's residence and spoke with Aska. Ex. M (Schulte Report), p. 1; Ex. A (Aska Dep.), p. 90; Ex. T (Yingling Dep.), p. 117-118, 137; Ex. C (Schulte Dec.), ¶ 18.

**RESPONSE:** Undisputed.

24. Defendants informed Aska that law enforcement had a warrant for Graham's arrest. Ex. A (Aska Dep.), p. 110.

**RESPONSE:** Undisputed.

25. During the investigative traffic stop, Defendants asked Aska about the whereabouts of fugitive Graham. Ex. T (Yingling Dep.), p. 137, 141; Ex. A (Aska Dep.), p. 93.

**RESPONSE:** Undisputed that Defendants asked Aska about Graham's whereabouts since they had not made a positive identification.

26. In response, Aska repeatedly denied Graham was in her residence and represented

6

that the male that officers observed exit and re-enter her residence was her daughter's boyfriend, even though she knew that was not true. Ex. A (Aska Dep.), p. 93-94, 180, 255-256; Ex. B (Montemayer Dep.), p. 295-296, 298-299; Ex. D (Schulte Dep.), p. 90, 101; Ex. M (Schulte Report), p. 1; Ex. C (Schulte Dec.), ¶ 18; Ex. T (Yingling Dep.), p. 141-142, 146.

**RESPONSE:** Disputed in part. That morning, Ms. Aska's cousin came into her bedroom and ushered her out of bed. ECF 253-1 at 77:2-10 (Aska Dep.). She did not see Graham because they had gotten into an argument the night before and he went to sleep in the basement. ECF 253-1 at 79:1-20 (Aska Dep.)

Further, according to Defendant Yingling, Ms. Aska told them that "her daughter's boyfriend, Trevon" was one of "males at her home". ECF 279-14 (Yingling Report). But Defendants have long confused her daughter's boyfriend (Treyvion Miles) with her grandchildren's father (Trevone Jackson). ECF 279-49 at 26:11-14 (Graham Dep.) ("Okay. So Trey Miles is a different person than Trevone Jackson?"); 52:6-8; ECF 279-1 (Aska Dep.) at 73:12-13 ("Treyvone Jackson is my grandchildren's father"); 73:9-10 ("Trevone Jackson?"). Ms. Aska did see Trevyon Miles, who was frequently at her home and came over to get snow pants. ECF 279-1 (Aska Dep.) at 67:6-80; 84:15-18; 67:14-17.

27. During the stop, Yingling discovered that Aska lied when she represented that the person who was seen exiting and reentering her residence was Aska's daughter's boyfriend (who was on parole), because Yingling looked up the boyfriend's information and discovered that the boyfriend was significantly shorter than Graham. Ex. N (Yingling Report), p. 1 ("Aska told us it was her daughter's boyfriend, Trevon Jackson. She also stated that Jackson was on parole. I then checked his information, and his height and weight were 5'6" 160 lbs. Graham is 6'4" 240"); Ex. M (Schulte Report), p. 1 ("Yingling advised me that Aska's daughter's boyfriend was currently on parole, and that he is significantly shorter than Graham. The individual seen at Aska's residence was a tall black male, which is consistent with the description of Graham."); *see also* Ex. T (Yingling Dep.), p. 141-142, 146, 149; Ex. B (Montemayer Dep.), p. 295-296.

**RESPONSE:** Disputed in part. Yingling reported that Aska told them that "her daughter's boyfriend, Trevon" was one of "males at her home". ECF 279-14 (Yingling Report). But Defendants mistook her daughter's boyfriend (Treyvion Miles) with her grandchildren's father (Trevone Jackson). ECF 279-49 at 26:11-14 (Graham Dep.) ("Okay. So Trey Miles is a different person than Trevone Jackson?"); 52:6-8; ECF 279-1 (Aska Dep.) at 73:12-13 ("Treyvone Jackson is my grandchildren's father"); 73:9-10 ("Trevone Jackson?"). Ms. Aska did see Trevyon Miles, who was frequently at her home and came over to get snow pants. ECF 279-1 (Aska Dep.) at 67:6-80; 84:15-18; 67:14-17.

28. Aska testified at her deposition that she told Defendants that she would take them back to her residence to prove that the person the officers observed exiting and reentering her residence was her daughter's boyfriend, not Graham. Ex. A (Aska Dep.), p. 180 (testifying that she told Defendants that she would take them back to her residence to prove that Graham was not there); *see also* Ex. M (Schulte Report), p. 1; Ex. D (Schulte Dep.), p. 90, 101; Ex. B (Montemayer Dep.), p. 295, 298-299; Ex. C (Schulte Dec.), ¶ 18; Ex. T (Yingling Dep.), p. 150.

**RESPONSE:** Disputed in part. Once Defendants Montemayer and Yingling stopped Ms. Aska's car, she refused to consent to taking them into her home. ECF 279-1 at 283:8-22 (Aska Dep). Defendants then threatened Ms. Aska that, if she wouldn't agree to help them, she would be "arrested for impeding [their] investigation". ECF 279-20 (Yingling Dep) at 140:4-15; 140:16-19; 141:4-8; 147:6-25; 150:13-16; ECF 279-14 at 2 (Yingling Report); ECF 279-2 (Montemayer Dep) at

7

143:6-21; 148:7-14;[2] ECF 279-20 (Yingling Dep.) at 149:4-6 ("we were trying to gain the knowledge… that [Graham] was there"). Defendants knew that they did not have consent to enter Ms. Aska's home, and planned to force entry. Ex. D (Inside Video) at 0:51-0:58 secs ("No. I'm in my house! Not here! No! ); ECF 279-15 at 2 (Sandoval Report (per Montemayer)) ("Upon approaching the residence Aska withdrew consent"); ECF 279-14 at 2 (Yingling USM-11 report) ("Aska stated that we needed to give her a minute before she would let us into the residence"); ECF 279-20 (Yingling Dep.) at 211:18-212:9)("we got to force entry").

29. Yingling estimated that the investigative traffic stop lasted approximately 20-30 minutes. *See* Ex. N (Yingling Report), p. 1 ("After 20-30 minutes of Aska stating that Graham was not there, she agreed to go back to the Chamberlain address…").

**RESPONSE:** Undisputed.

### D. The Return to Aska's Residence and Her Subsequent Removal from the Home's Entrance Due to Dangerous Circumstances and Safety Considerations

30. On January 11, 2022, Aska had surveillance cameras throughout her residence, including in her living room and at the front door. Ex. A (Aska Dep.), p. 119, 122. Exhibits Z, AA-MM, and QQ-VV, are video recordings captured by Aska's surveillance cameras on January 11, 2022. *See* Ex. A (Aska Dep.), p. 126-127, 133; Ex. YY (Aska Resp. to Request to Admit), p. 1-2.

**RESPONSE:** Undisputed.

31. At approximately 1:43 pm, Aska, Yingling, and Montemayer returned to Aska's residence. Ex. Z (Front Door Cam) at 00:48-1:32. After parking, Aska, Yingling, and Montemayer exited the vehicle and walked towards the front door of Aska's residence, with Aska leading the way. Ex. Z (Front Door Cam), at 00:54-1:35; Ex. A (Aska Dep.), p. 94, 105.

**RESPONSE:** Disputed in part. Ms. Aska refused to go with Yingling and Montemayer. ECF 279-1 at 283:8-22 (Aska Dep). Defendants then threatened her that, if she wouldn't agree to help them, she would be "arrested for impeding [their] investigation". ECF 279-20 (Yingling Dep) at 140:4-15; 140:16-19; 141:4-8; 147:6-25; 150:13-16; ECF 279-14 at 2 (Yingling Report); ECF 279-2 (Montemayer Dep) at 143:6-21; 148:7-14.

32. Schulte also approached the front door of Aska's residence. Ex. C (Schulte Dec.), ¶ 19; Ex. M (Schulte Report), p. 1. Schulte was carrying an AR-15 rifle because of Graham's history of violence. Ex. C (Schulte Dec.), ¶ 19.

**RESPONSE:** Disputed in part. Defendant Schulte conceded he did not actually recall being briefed about Graham's history of violence. ECF 279-4 at 84:19-24 (Schulte Dep.) ("Again, I don't recall what was said at the briefing') ; *id.* at 84:25-85:7 ("I don't recall what was actually communicated that morning"). Schulte's declaration was not based on what actually happened, but information he apparently learned to believe after-the-fact. *Id.* at 85:8-12 ("correct").

33. While approaching the front door with the three officers, Aska never said that she did not consent to the officers entering her home. Ex. B (Montemayer Dep.), p. 106-108, 299; Ex. T (Yingling Dep.), p. 179; *see also* Ex. D (Schulte Dep.), p. 101 (As they approached the front door, Aska stated she was going to let them into the house to confirm that the individual they saw was her

---

[2] According to Montemayer, Aska was free to leave after she was pulled over. ECF 279-2 at 146:23-147:1 (Montemayer dep) ("yes).

8

daughter's boyfriend and not Graham).

**RESPONSE:** Disputed in part. Defendants knew that they did not have consent to enter Ms. Aska's home, and therefore decided to force entry. Ex. D (Inside Video) at 0:51-0:58 secs ("No. I'm in my house! Not here! No! ); ECF 279-15 at 2 (Sandoval Report (per Montemayer)) ("Upon approaching the residence Aska withdrew consent"); ECF 279-14 at 2 (Yingling USM-11 report) ("Aska stated that we needed to give her a minute before she would let us into the residence"); ECF 279-20 (Yingling Dep.) at 211:18-212:9)("we got to force entry").

34. It was law enforcement's understanding that Aska was opening the front door of her residence to allow them inside. Ex. D (Schulte Dec.), ¶¶ 20-21; Ex. B (Montemayer Dep.), p. 299-300; Ex. T (Yingling Dep.), p. 155-156.

**RESPONSE:** Disputed in part. The cited exhibit to Ex. D does not support this. Further, Ms. Aska did not want to allow Yingling and Montemayer inside her home and refused. ECF 279-1 at 283:8-22 (Aska Dep). Defendants then threatened her that, if she wouldn't agree to help them, she would be "arrested for impeding [their] investigation". ECF 279-20 (Yingling Dep) at 140:4-15; 140:16-19; 141:4-8; 147:6-25; 150:13-16; ECF 279-14 at 2 (Yingling Report); ECF 279-2 (Montemayer Dep) at 143:6-21; 148:7-14.

35. Upon reaching the front door, Aska attempted to open it, but it was locked, and she did not have a key. Ex. A (Aska Dep.), p. 105; Ex. AA (Front Door Cam) at 00:41-00:52; Ex. C (Schulte Dec.), ¶20; Ex. D (Schulte Dep.), p. 172; Ex. T (Yingling Dep.), p. 156.

**RESPONSE:** Disputed in part. Further, Ms. Aska refused entry into her home. ECF 279-1 (Aska Dep.) at 283:8-22. But Defendants Montemayer and Yingling threatened her that, if she wouldn't agree to help them, she would be "arrested for impeding [their] investigation". ECF 279-20 (Yingling Dep) at 140:4-15; 140:16-19; 141:4-8; 147:6-25; 150:13-16; ECF 279-14 at 2 (Yingling Report); ECF 279-2 (Montemayer Dep) at 143:6-21; 148:7-14.

36. After Aska could not unlock the front door, Malone exited the red sedan and approached the front door of the residence. Ex. A (Aska Dep.), p. 108; Ex. AA (Front Door Cam) at 00:40-01:01. Malone said he could open the front door and offered to do so, to which Aska did not object. Ex. A (Aska Dep.), p. 108-109; Ex. AA (Front Door Cam) at 00:40-01:01.

**RESPONSE:** Disputed to the extent Defendants suggest Ms. Aska did not object to officers entering her home. ECF 279-1 (Aska Dep.) at 283:8-22; Ex. D (Inside Video) at 0:51-0:58 secs ("No. I'm in my house! Not here! No! ); ECF 279-15 at 2 (Sandoval Report (per Montemayer)) ("Upon approaching the residence Aska withdrew consent").

37. Malone then walked around the side of the house, entered the house, and, at approximately 1:51 pm, opened the front door from within. Ex. AA (Front Door Cam) at 00:40-01:46; Ex. BB (Livingroom Cam) at 00:04-00:09. Upon Malone opening the front door, Aska said "Thank you, Jesus!" Ex. B (Montemayer Dep.), p. 299-300; Ex. BB (Livingroom Cam) at 00:10- 00:12.

**RESPONSE:** Disputed to the extent Defendants suggest Ms. Aska consented to officers entering her home. From the very beginning, Ms. Aska refused entry into her home. ECF 279-1 (Aska Dep.) at 283:8-22. But Defendants Montemayer and Yingling threatened her that, if she wouldn't agree to help them, she would be "arrested for impeding [their] investigation". ECF 279-20 (Yingling Dep) at 140:4-15; 140:16-19; 141:4-8; 147:6-25; 150:13-16.

38. Malone exited the house, and Aska stepped through the threshold and placed her purse down on a rack next to the front door. Ex. A (Aska Dep.), p. 110-111, 127-128; Ex. BB

(Livingroom Cam) at 00:12- 00:23.

**RESPONSE:** Undisputed.

39. Montemayer and Yingling remained positioned right outside the front door, with Schulte positioned a few feet behind them. Ex. A (Aska Dep.), p. 115; Ex. B (Montemayer Dep.), p. 262; Ex. T (Yingling Dep.), p. 157-158; Ex. BB (Livingroom Cam) at 00:12-00:25.

**RESPONSE:** Undisputed.

40. After stepping into her residence, Aska told Montemayer, Yingling, and Schulte that she "need[ed] a second" before letting them in. Ex. A (Aska Dep.), p. 110-11; *see also id.*, p. 128 ("If you give me two seconds, I will let you guys come in."); Ex. BB (Livingroom Cam) at 00:22-01:21; Ex. CC (Front Door Cam) at 00:07. Aska never explained why she needed a few seconds before letting them in, despite law enforcement repeatedly asking why she needed a few seconds. Ex. A (Aska Dep.), p. 182; Ex. B (Montemayer Dep.), p. 302-303; Ex. BB (Livingroom Cam) at 00:22-01:26.

**RESPONSE:** Undisputed.

41. The officers responded that they were not comfortable with Aska walking around her house, unescorted, with a violent fugitive hiding somewhere inside. Ex. BB (Livingroom Cam) at 00:30-00:32; Ex. A (Aska Dep.), p. 110-111; Ex. T (Yingling Dep.), p. 209-210; Ex. B (Montemayer Dep.), p. 163, 175-178, 184, 302 (officers had serious safety concerns about Aska being inside the residence). It was a very dangerous situation, and the officers were concerned that Graham, who had a violent criminal history with mental health diagnosis and substance abuse issues, would do harm to Aska and/or law enforcement. Ex. B (Montemayer Dep.), p. 177-178, 184, 187-188, 195-196, 199, 281, 302; Ex. T (Yingling Dep.), p. 173.

**RESPONSE:** Disputed. The cited evidence does not support that Defendant Montemayer and Yingling were not comfortable with her walking around "her house, unescorted, with a violent fugitive hiding somewhere inside." *See* ECF 279-28 (Livingroom Cam) at 00:30-00:32; ECF 279-1 (Aska Dep.), p. 110-111; ECF 279-20 (Yingling Dep.), p. 209-210; Ex. B. Further, Defendants did not see or hear anything indicative of violence, noises, disturbances, or threats. ECF 279-20 (Yingling Dep.) at 174:19-21 ("nothing")); 171:19-21 ("As long as she was with us, no"); ECF 279-2 at 111:23-25 (Montemayer dep) ("I don't believe so); 161:8-10 ("Not that I recall"). There was no threat, emergency, or exigency. ECF 279-20 (Yingling Dep.) at 167:10; ECF 279-2 at 185:1-2 (Montemayer dep) ("I -- I don't know if I perceived her as a threat at this point"); ECF. 279-2 at 173:20-25) ("I don't believe so").

42. Aska then asked, "Can I check and see if [Graham] is here," to which the officers respond, "No." Ex. A (Aska Dep.), p. 128-129. Aska then informed the officers that Graham was not inside her residence, which Aska (and the officers) knew to be false. Ex. A (Aska Dep.), p. 128-129; Ex. BB (Livingroom Cam) at 01:25; Ex. S (Affidavit), ¶8; Ex. B (Montemayer Dep.), p. 101-103, 116-121, 296-298; Ex. M (Schulte Report), p. 1.

**RESPONSE:** Disputed in part. The cited evidence does not support that Ms. Aska and the officers knew Graham was inside her residence. *See* Ex. A (Aska Dep.), p. 128-129; Ex. BB (Livingroom Cam) at 01:25; Ex. S (Affidavit), ¶8; Ex. B (Montemayer Dep.), p. 101-103, 116-121, 296-298; Ex. M (Schulte Report), p. 1. Ms. Aska asked the officers at least five times to "give [her] a second" because she had just woken up, had not seen him that morning, and did not know whether Graham was in the house. Ex. D (Inside Video) at 0:01-00:18 secs ("No, I don't").

43. While exposed at the entrance of the residence, Aska continued to stall and as the

10

situation grew even more dangerous, officers ordered Aska to exit the residence, to which Aska responded, "No." Ex. A (Aska Dep.), p. 112, 182; Ex. BB (Livingroom Cam) at 00:19-01:28; Ex. CC (Front Door Cam) at 00:12-00:14; Ex. M (Schulte Report), p. 1. While refusing to exit the residence, Aska took a step back further inside of the residence and away from the officers. Ex. BB (Livingroom Cam) at 01:28; Ex. A (Aska Dep.), p. 182.

**RESPONSE:** Disputed in part. Reflective of a lack of exigency, a "few minutes" transpired at the doorway and there was no threat, emergency, or exigency. ECF 279-20 (Yingling Dep.) at 167:10; ECF 279-2 at 185:1-2 (Montemayer dep) ("I -- I don't know if I perceived her as a threat at this point"); ECF. 279-2 at 173:20-25) ("I don't believe so"). Defendant Yingling then lunged at Ms. Aska and she shouted her refusal at the top of her lungs. Ex. D (Inside Video) at 0:51-0:58 secs ("No. I'm in my house! Not here! No! ).

44. Aska's obstruction and conduct created a very dangerous situation as the front door of a residence, or threshold, is known as the "fatal funnel," because it is generally considered one of the most dangerous locations for law enforcement (and others, including Aska) to be when executing an arrest warrant for a violent fugitive like Graham. Ex. C (Schulte Dec.), ¶ 19; Ex. D (Schulte Dep.), p. 168; Ex. M (Schulte Report), p. 1; Ex. B (Montemayer Dep.), p. 300-301.

**RESPONSE:** Disputed in part. Ms. Aska never consented to Defendants entering her home and there was no threat, emergency, or exigency in her doorway. ECF 279-20 (Yingling Dep.) at 167:10; ECF 279-2 at 185:1-2 (Montemayer dep) ("I -- I don't know if I perceived her as a threat at this point"); ECF. 279-2 at 173:20-25) ("I don't believe so").

45. After Aska again refused to comply with the officers' orders to exit the residence, and stepped deeper into the home, Yingling reached through the front door for Aska's arm to try to lead Aska back outside. Ex. A (Aska Dep.), p. 129-130, 182-183; Ex. BB (Livingroom Cam) at 01:28; Ex. T (Yingling Dep.), p. 158, 166-167.

**RESPONSE:** Disputed in part. Defendant Yingling then lunged at Ms. Aska and she shouted her refusal at the top of her lungs. Ex. D (Inside Video) at 0:51-0:58 secs ("No. I'm in my house! Not here! No! ).

46. In response, Aska pulled further away into her residence and braced herself from being removed by placing her left hand on the inside wall next to the interior side of the front door. Ex. A (Aska Dep.), p. 130, 183; Ex. B (Montemayer Dep.), p. 157-158; Ex. T (Yingling Dep.), p. 180, 182; Ex. BB (Livingroom Cam) at 01:25-01:44. Aska also hooked her left leg around the front door to prevent herself from being removed from the residence. Ex. A (Aska Dep.), p. 130; Ex. B (Montemayer Dep.), p. 158-159; Ex. T (Yingling Dep.), p. 250 (Aska "hooked her foot behind the door…throwing everybody off balance."); Ex. BB (Livingroom Cam) at 01:42-01:44.

**RESPONSE:** Disputed in part. Yingling rushed into Ms. Aska's home, slammed her against a wall, pressed her against a stand, and grabbed Aska by her neck and hair. Ex. E (photos); ECF 279-1 at 240:22-241:1; 241:16-22 (Aska dep); ECF 279-20 (Yingling Dep.) at 220:15-17 (pressed Aska's body against the stand); ECF 279-2 at 192:2-8 (Montemayer dep) (admitting that Yingling forced Aska to the wall "while pulling"); ECF 279-20 (Yingling Dep.) at 188:17-24 ("I know I put my hand on her -- in her neck and back area"); 218:14-17 (Yingling admits his hands are grabbing Aska's "shoulder, lower neck"). Aska begged Montemayer for help. Ex. D (Inside Video) at 0:44-0:56 secs. ("Help!")

47. Aska admitted at her deposition that she resisted law enforcement's attempts to remove her from the residence. Ex. A (Aska Dep.), p. 214, 240.

11

**RESPONSE:** Disputed in part. Ms. Aska never fought back or attempted to flee during this brutalization, ECF 279-20 (Yingling Dep.) at 183:18-22; 185:5-6, but tried to shield herself from the brutalization by taking a slight step backwards, ECF 279-2 (Montemayer Dep.) at 186:3-7, and bracing her foot around the door to prevent her from being slung onto the concrete. ECF 279-2 (Montemayer Dep.) at 160:7-12.

48. While resisting Yingling's attempts to remove her from the residence, Aska was seen reaching for something inside the residence. Ex. B (Montemayer Dep.), p. 164-165; Ex. A (Aska Dep.), p. 132; Ex. T (Yingling Dep.), p. 174, 176, 182; Ex. BB (Livingroom Cam) at 01:29- 01:30. At that point, the officers believed Aska to be a threat, both to them and to herself given their positioning and vulnerability. *See* Ex. B (Montemayer Dep.), p. 162-163, 190, 192-193, 216, 222, 225; Ex. T (Yingling Dep.), p. 221.

**RESPONSE:** Disputed in part. Ms. Aska slammed her against a wall and pressed her against a stand where her purse was located. Ex. E (photos). Further, Montemayer claims force was used against Ms. Aska not because she was a threat, but for "her safety", ECF 279-2 at 154:17-19 (Montemayer Dep.)

49. Yingling continued his attempt to physically remove Aska from the residence for the safety of the officers and Aska herself. *See* Ex. T (Yingling Dep.), p. 167 ("[events at the] "threshold…began to become… an officer safety issue. With the open stairwell to the left and…with [Graham's] weapons history…he could begin firing at any time."); *see also id.*, p. 233 ("My back's to the stairwell…I don't know if [Graham is] behind us with the weapons he had… And I'm not going to leave [Aska] behind because…we are liable for her safety [] also.").

**RESPONSE:** Disputed in part. Yingling admits there was no concern for Aska's safety so long as he and Montemayer were present. ECF 279-20 (Yingling Dep.) at 171:19-21.

50. While Yingling attempted to remove Aska from the residence and while Aska continued to forcibly resist, Montemayer removed Aska's hand from the doorframe of the residence so that Aska could be removed from the residence and the very dangerous situation presented. Ex. B (Montemayer Dep.), p. 154, 196, 202-204, 210; Ex. D (Schulte Dep.), p. 216; Ex. BB (Livingroom Cam) at 01:30-01:42; Ex. P (Still Photo); Ex. Q (Still Photo).

**RESPONSE:** Disputed in part. Montemayer decided to add his strength to Yingling's to force Ms. Aska out of her home. ECF 279-2 (Montemayer Dep.) at 202:14-19; 203:7-18; 223:5-19; Ex. E (photos) at 2; Ex. D (Inside video) at 1:01-1:07 secs. Ms. Aska was then slung from inside her home, into the air, and onto the concrete outside. Ex. F (photos); Ex D (Inside video) at 1:07-1:09 secs; Ex. G (Outside video) at 0:01-0:08 secs; ECF 279-20 (Yingling Dep.) at 258:22-259:13 ("the concrete sidewalk, yeah"); ECF 279-2 (Montemayer Dep.) at 224:7-10 ("It -- it looks like it, yes"). Ms. Aska never fought back or attempted to flee during this brutalization, ECF 279-20 (Yingling Dep.) at 183:18-22; 185:5-6, but tried to shield herself from the brutalization by taking a slight step backwards, ECF 279-2 (Montemayer Dep.) at 186:3-7, and bracing her foot around the door to prevent her from being slung onto the concrete. ECF 279-2 (Montemayer Dep.) at 160:7-12.

51. At approximately 1:53 pm, Yingling removed Aska from the residence and onto the front lawn. Ex. CC (Front Door Cam) at 00:32; Ex. BB (Livingroom Cam) at 01:44.

**RESPONSE:** Disputed in part. Ms. Aska was then slung from inside her home, into the air, and onto the concrete outside. Ex. F (photos); Ex D (Inside video) at 1:07-1:09 secs; Ex. G (Outside video) at 0:01-0:08 secs; ECF 279-20 (Yingling Dep.) at 258:22-259:13 ("the concrete sidewalk, yeah"); ECF 279-2 (Montemayer Dep.) at 224:7-10 ("It -- it looks like it, yes").

12

52. In the process of her resisting her removal from the entrance of the home, Aska lost her footing, fell out her front door and down the front steps of the home, banging and scraping her knee. Ex. B (Montemayer Dep.), p. 86-87, 223-224; Ex. H (Goodwin Report), p. 1; Ex. O (Montemayer Report), p. 2; Ex. T (Yingling Dep.), p. 47, 189, 236, 250.

**RESPONSE:** Disputed in part. Ms. Aska was slung from inside her home, into the air, and onto the concrete outside. Ex. F (photos); Ex D (Inside video) at 1:07-1:09 secs; Ex. G (Outside video) at 0:01-0:08 secs; ECF 279-20 (Yingling Dep.) at 258:22-259:13 ("the concrete sidewalk, yeah"); ECF 279-2 (Montemayer Dep.) at 224:7-10 ("It -- it looks like it, yes"). Ms. Aska was obviously injured – she he was bleeding profusely. Ex. I (photo). In their reports, the officers omitted the force applied in their reports, and insist improperly suggests that Aska's injuries resulted from her own clumsiness. ECF 279-20 at 40:13-16 (Yingling claims that Aska simply "lost her footing and fell down the front steps"); ECF 279-2 (Montemayer Dep.) at 87:4-7 (Montemayer claims "she missed the stair"); ECF 279-15 (Sandoval Report (per Montemayer)) at 3 ; 279-14 (Yingling Report)at 2. Ms. Aska was diagnosed with multiple injuries, including a patellar subluxation, knee contusion, knee abrasion, and decreased range of motion. Ex. J (Babka Report) at 3.

53. Meanwhile, Montemayer remained positioned at the threshold of the residence, while attempting to observe and/or make contact with fugitive parolee Graham. *See* Ex. CC (Front Door Cam) at 00:47-01:37; Ex. BB (Livingroom Cam) at 01:48-02:05.

**RESPONSE:** Disputed in part. Montemayer decided to add his strength to Yingling's to force Ms. Aska out of her home. ECF 279-2 (Montemayer Dep.) at 202:14-19; 203:7-18; 223:5-19; Ex. E (photos) at 2; Ex. D (Inside video) at 1:01-1:07 secs.

54. Aska admitted at her deposition that: Montemayer did not threaten her; the only statement Montemayer made to her was "[y]ou don't want to go to prison for this guy"; and he did not threaten to send her to jail if she went to the hospital to receive medical treatment, did not take her phone, did not badger her into contacting Graham to assist with Graham's surrender, did not slam her against the wall, and did not grab her by her neck or pull her hair. Ex. A (Aska Dep.), p. 256, 260-262, 264-266.

**RESPONSE:** Disputed in part. Defendants stopped Ms. Aska's vehicle and threatened her that, if she wouldn't agree to help them, she would be "arrested for impeding [their] investigation". ECF 279-20 (Yingling Dep) at 140:4-15; 140:16-19; 141:4-8; 147:6-25; 150:13-16; ECF 279-14 at 2 (Yingling Report); ECF 279-2 (Montemayer Dep) at 143:6-21; 148:7-14. Further disputed to the extent Defendants suggests that Montemayer did not partake in forcing Ms. Aska out of her home. ECF 279-2 (Montemayer Dep.) at 202:14-19; 203:7-18; 223:5-19; Ex. E (photos) at 2; Ex. D (Inside video) at 1:01-1:07 secs.

55. The only physical contact between Montemayer and Aska was Montemayer removing Aska's hand from the doorframe of the residence so that Aska could be removed from the threshold of the residence safely. Ex. B (Montemayer Dep.), p. 154, 202, 210; Ex. D (Schulte Dep.), p. 216; Ex. BB (Livingroom Cam) at 01:30-01:42; Ex. P (Still Photo); Ex. Q (Still Photo). The physical contact between Montemayer and Aska lasted no more than five (5) seconds. *See* Ex. BB (Livingroom Cam) at 01:38-01:43; *see also* Ex. A (Aska Dep.), p. 114 (testifying that she dealt primarily with Yingling).

**RESPONSE:** Disputed in part. Montemayer assisted Yingling in forcing Ms. Aska out of her home. ECF 279-2 (Montemayer Dep.) at 202:14-19; 203:7-18; 223:5-19; Ex. E (photos) at 2; Ex.

13

D (Inside video) at 1:01-1:07 secs. Instead of preventing Yingling from manhandling Aska, Montemayer decided not to intervene while Aska screamed. ECF 279-2 (Montemayer Dep.) at 195:15-23 ("no, it doesn't appear I did"); 200:14-16 ("She was screaming").

56. Montemayer testified that he believes Yingling's use of force on January 11, 2022, was appropriate and necessary to gain control over Aska so as to remove Aska and officers from the very dangerous situation and position of vulnerability. Ex. B (Montemayer Dep.), p. 222-223, 246; *see also* Ex. T (Yingling Dep.), p. 180-182; *id.*, p. 171 ("We were presented with a – threat. We controlled the situation, and I believe we handled the situation correct.").

**RESPONSE:**

57. Graham testified that he probably would have shot the officer that used force on Aska if he had seen it. Ex. WW (Graham Dep.), p. 99-100.

**RESPONSE:** Undisputed.

### E. Yingling Places Aska Under Arrest and Aska is Placed in Law Enforcement Vehicle while Graham Remains Barricaded in Residence with a Gun

58. While on the front lawn and at approximately 1:53 pm, Yingling placed Aska under arrest. Ex. CC (Front Door Cam) at 00:40-01:38; *see also* Ex. B (Montemayer Dep.), p. 112; Ex. D (Schulte Dep.), p. 109; Ex. U (Still Photo). Officer Soderstrom assisted Yingling in Aska's arrest. Ex. W (Soderstrom Body Cam) at 00:47-02:28; Ex. CC (Front Door Cam) at 00:40-01:38; Ex. V (Soderstrom Report), p. 1.

**RESPONSE:** Disputed in part. Once Ms. Aska had been thrown to the concrete, Yingling tackled Ms. Aska in the snow, and yelled "get on the fucking ground!" Ex. G (Outside video) at 0:10-0:14 secs. Yingling applied pressure to Ms. Aska's shoulders, pushed her in the snow, and twisted her arms. Ex. G (Outside video) at 0:11-0:20 secs. Confusingly, Yingling scolded Aska, "don't fucking come running up on us", although Aska had not approached them in any aggressive manner. *Id.* at 1:03-1:06; ECF 279-2 (Montemayer Dep.) at 163:24-164:8. Then, for the very first time, Yingling told Ms. Aska that she was "under arrest" for, in his words, "lying to us". Ex. G (Outside video) at 0:42-0:49 secs); Ex. H (Soderstrom Dep.) at 64:23-65:1.

There was no reason to believe this was deserved, or that Ms. Aska was any sort of threat to the officers or anyone else; and the officers knew, any reasonable officer would have known, they had no probable cause to believe she had committed a crime. ECF 279-20 (Yingling Dep.) at 166:8-12 (they did not enter her home because they observed her committing any crime); 167:1-4 (aside from not believing that Ms. Aska did not know if Graham was in the house, admitting that he could not identify any crimes that had been committed at that moment); ECF 279-20 (Yingling Dep.) at 167:5-14 (Montemayer arrested her not for any crime of lying, but for "safety"); ECF 279-2 (Montemayer Dep.) at 111:15-22 (admitting Aska was not arrested for lying or harboring a fugitive).

Montemayer and Yingling continued to shift their explanation for using force against: Montemayer claims it was for "her safety", ECF 279-2 (Montemayer Dep.) at 154:17-19, but Yingling admits there was no concern for Aska's safety so long as they were present. ECF 279-20 (Yingling Dep.) at 171:19-21.

59. Yingling made the decision to arrest Aska because she had knowingly lied to law enforcement about Graham's whereabouts, failed to obey verbal commands from the officers, physically resisted Yingling's attempts to safely remove her from the threshold of the residence, and otherwise obstructed law enforcement and their investigation. Ex. T (Yingling Dep.), p. 166- 167, 181;

14

*see also*, Ex. B (Montemayer Dep.), p. 111-112, 236; Ex. D (Schulte Dep.), p. 109-110, 175-176, 178, 180-181; Ex. M (Schulte Report), p. 1; Ex. V (Soderstrom Report), p. 1; Ex. U (Still Photo).

**RESPONSE:** Disputed in part. They had no probable cause to believe Ms. Aska had committed a crime, including lying to an officer. ECF 279-20 (Yingling Dep.) at 166:8-12 (they did not enter her home because they observed her committing any crime); 167:1-4 (aside from not believing that Ms. Aska did not know if Graham was in the house, admitting that he could not identify any crimes that had been committed at that moment); ECF 279-20 (Yingling Dep.) at 167:5-14 (Montemayer arrested her not for any crime of lying, but for "safety"); ECF 279-2 (Montemayer Dep.) at 111:15-22 (admitting Aska was not arrested for lying or harboring a fugitive).

60. At approximately 1:55 pm, Dekalb officers escorted Aska down the street and safely away from the residence, removed Aska's handcuffs, and placed her in a police vehicle with the door open. Ex. DD (Front Door Cam) at 00:00-00:59; Ex. H (Goodwin Report), p. 1; Ex. V (Soderstrom Report), p. 1; Ex. W (Soderstrom Body Cam) at 02:29-05:55.

**RESPONSE:** Disputed in part. Ms. Aska was not escorted from her home and detained for her safety. ECF 279-20 (Yingling Dep.) at 171:19-21.

61. While escorting Aska down the street, Aska told Detective Soderstrom that Graham had a gun and told Aska that he was going to kill her entire family. *See* Ex. W (Soderstrom Body Cam) at 03:49-04:00; Ex. A (Aska Dep.), p. 144, 147 (Aska testified she told Soderstrom that Graham said he would "shoot your fucking kids" and "kill [her] whole fucking family.").

**RESPONSE:** Undisputed.

62. While inside the vehicle, Aska showed Officer Goodwin live video footage from her security cameras in which Graham was seen in the residence holding a firearm. Ex. H (Goodwin Report), p. 1; Ex. N (Yingling Report), p. 1; Ex. M (Schulte Report), p. 2.

**RESPONSE:** Undisputed.

63. With Graham still barricaded inside the residence, Aska admitted to Schulte and other officers that fugitive Graham was, in fact, in her residence with firearms and ammo and that Graham had been living with her for quite some time. Ex. M (Schulte Report), p. 2 ("Aska advised me that Graham was inside her house, that he has several firearms, and that she was worried that he was going to kill her, and her son… She also advised that he has several hiding spots throughout her residence where he hides guns and drugs."); *see also* Ex. C (Schulte Dec.), ¶ 29; Ex. A (Aska Dep.), p. 144-147, 159-162, 183-184; Ex. S (Affidavit), ¶ 11(c);

**RESPONSE:** Undisputed.

64. Aska was not criminally charged with harboring a known fugitive, lying to law enforcement, obstructing law enforcement's investigation, or for any other misconduct that took place on January 11, 2022. Ex. D (Schulte Dep.), p. 182, Ex. A (Aska Dep.), p. 267.

**RESPONSE:** Undisputed.

    **F.** **Law Enforcement Performs a Protective Sweep of Aska's Residence**

65. On January 11, 2022, at approximately 3:42 pm, after a two-hour standoff, Graham surrendered to law enforcement and was taken into custody. Ex. C (Schulte Dec.), 31; Ex. N (Yingling Report), p. 1; Ex. A (Aska Dep.), p. 65, 70.

**RESPONSE:** Undisputed.

15

66. Subsequently, Graham was convicted of being a felon in possession of a firearm and violation of the sex offender registry in connection with his actions on January 11, 2022. Ex. WW (Graham Dep.), p. 21-24, 33-34.

**RESPONSE:** Undisputed.

67. After Graham's surrender, Aska repeatedly consented to law enforcement entering and searching her residence. *See* Ex. A (Aska Dep.), p. 144, 178 (testifying she gave verbal consent for law enforcement to enter her residence and to perform a search); Ex. W (Soderstrom Body Cam) at 03:26-03:27 (at 1:56 pm, Aska told Soderstrom she "would let [the officers] in"); Ex. M (Schulte Report), p. 2 (prior to Graham's surrender, "Aska [] gave verbal permission for law enforcement personnel to enter her residence in order to locate Graham."); Ex. X (Goodwin Body Cam) at 2:37:05 (Aska at 4:29 pm: "You can go through whatever you want"); Ex. Y (Abonce Body Cam) at 1:12:12-1:12:18 (Aska at 4:31 pm: "You guys can search whatever you want…I don't give a shit. I don't care. Please."); *see also* Ex. M (Schulte Report), p. 2; Ex. S (Affidavit), ¶ 11(d).

**RESPONSE:** Disputed in part. Aska had already refused entry for more than five hours, beginning at approximately 10:30am when Defendants Montemayer and Yingling stopped her vehicle. ECF 279-1 at 283:8-22 (Aska Dep). Aska finally agreed to officers entering at 4:31pm, more than 30 minutes after the unlawful search commenced. See Ex. Y (Abonce Body Cam) at 1:12:12-1:12:18 .

68. After Graham's arrest, Schulte ordered officers to conduct a security sweep, also known as a protective sweep, of the residence to make sure there were not any additional people inside the home that could be a threat to law enforcement or the public and to secure the scene while Dekalb officers obtained a search warrant. Ex. D (Schulte Dep.), p. 188-189; Ex. J (Wadsworth Dep.), p. 45-46, 81; Ex. K (McCloud Dep.), p. 62, 64, 76; Ex. C (Schulte Dec.),¶ 32.

**RESPONSE:** Disputed this part. This was not a protective sweep; instead, officers search Ms. Aska's private areas: closets, drawers, and her children's belongings. PSOF¶¶33-38. In reality, Defendants were looking for drugs the state's chief of parole believed were being transported into a state prison. PSOF ¶5.

69. At the time of the protective sweep, the officers did not know if anyone else was present inside of Aska's residence. Ex. K (McCloud Dep.), p. 76; *see also* Ex. D (Schulte Dep.), p. 196 (officers conducted a protective sweep to make sure no one else was inside the residence and to secure the scene).

**RESPONSE:** Disputed in part. Defendants were not simply searching for a person, but going through Ms. Aska's private areas: closets, drawers, and her children's belongings. PSOF¶¶33-38. In reality, Defendants were looking for drugs the state's chief of parole believed were being transported into a state prison. PSOF ¶5.

70. Montemayer and Yingling were not involved in the protective sweep of Aska's residence. *See* Ex. Y (Abonce Body Cam) at 0:38:30-1:36:13; Ex. PP (Gardner Body Cam) at 23:58-3:19:39; Ex. QQ (Kitchen Video Cam); Ex. RR (Basement Video Cam); Ex. SS (Basement Video Cam); Ex. TT (Basement Video Cam); Ex. UU (Kitchen Video Cam); Ex. VV (Basement Video Cam).

**RESPONSE:** Disputed in part. This was not a protective sweep, as officers were going through Ms. Aska's private areas: closets, drawers, and her children's belongings. PSOF¶¶33-38. Further, Montemayer and Yingling were both inside Aska's home to search it before receiving any lawful search warrant. PSOF ¶¶33-38.

71. Meanwhile, Montemayer went to the Dekalb Police Department to assist with filling

16

out an affidavit for a search warrant for Aska's residence based on, among other things, Aska's report that Graham had firearms and drugs hidden throughout the residence. Ex. B (Montemayer Dep.), p. 291-292; Ex. C (Schulte Dec.), ¶ 30; *see also*, Ex. S (Affidavit).

**RESPONSE:** Undisputed.

### G. Dekalb Officers Search Aska's Residence Pursuant to Search Warrant

72. Dekalb officers returned with a search warrant for the residence that was signed at approximately 4:30 pm. Ex. C (Schulte Dec.), ¶33; Ex. OO (Paul Report), p. 1. Dekalb officers executed the search warrant of 210 Chamberlain Drive, starting at approximately 5:27 pm. Ex. OO (Paul Report), p. 2; Ex. EE (Basement Video Cam); Ex. FF (Basement Video Cam); Ex. GG (Basement Video Cam); Ex. HH (Kitchen Video Cam); Ex. II (Kitchen Video Cam); Ex. JJ (Kitchen Video Cam); Ex. KK (Kitchen Video Cam); Ex. LL (Kitchen Video Cam); Ex. MM (Kitchen Video Cam).

**RESPONSE:** Undisputed.

73. Firearms, ammunition, high-capacity magazines and narcotics were recovered by the Dekalb officers during the search of the residence. Ex. C (Schulte Dec.), ¶34: Ex. OO (Paul Report), p. 2-4; Ex. A (Aska Dep.), p. 184-185.

**RESPONSE:** Undisputed.

74. Montemayer and Yingling were not involved in the search of Aska's residence pursuant to the search warrant. *See* Ex. OO (Paul Report), p. 2; Ex. EE (Basement Video Cam);Ex. FF (Basement Video Cam); Ex. GG (Basement Video Cam); Ex. HH (Kitchen Video Cam); Ex. II (Kitchen Video Cam); Ex. JJ (Kitchen Video Cam); Ex. KK (Kitchen Video Cam); Ex. LL (Kitchen Video Cam); Ex. MM (Kitchen Video Cam).

**RESPONSE:** Disputed. Montemayer and Yingling were both inside Aska's home to search it before receiving any lawful search warrant. PSOF ¶¶33-38.

### IV. ASKA'S DAMAGES CLAIM

75. On January 11, 2022, an ambulance arrived on the scene and paramedics treated Aska's left knee. Ex. A (Aska Dep.), p. 156-157, 183, 187-188; Ex. H (Goodwin Report), p. 1; Ex. D (Schulte Dep.), p. 198. At the scene, Aska declined any further medical treatment. Ex. H (Goodwin Report), p. 1; Ex. A (Aska Dep.), p. 157.

**RESPONSE:** Undisputed.

76. On January 14, 2022, officers went to Aska's residence, at which time they interviewed Aska with their body worn cameras activated. *See, e.g.*, Ex. E (Abonce Body Cam). Aska can be seen on the body camera video footage bending her knee, walking without difficulty, and appearing to be in no physical distress. *Id.* at 00:47-00:57.

**RESPONSE:** Disputed in part. Ms. Aska complained that her knee was hurting. *See* Ex E at 1:38-40. She he was bleeding profusely. Ex. I (photo).

77. On or about January 16, 2022, Aska underwent an x-ray and ultrasound of her knee. Ex. A (Aska Dep.), p. 188-191. The tests revealed a knee with normal alignment, without fracture, and no dislocation. *Id.*, p. 190.

**RESPONSE:** Undisputed that Aska testified to this. .

17

78. On January 18, 2022, Aska obtained an MRI of her knee. Ex. A (Aska Dep.), p. 195. The MRI revealed no tears. *Id.* Aska decided against doing any physical therapy or knee exercises. *Id.*, p. 196-197.

**RESPONSE:** Undisputed that Aska testified to this. .

79. Aska's left knee does not interfere with her ability to perform activities of daily living. Ex. A (Aska Dep.), p. 199.

**RESPONSE:** Undisputed that Aska testified to this. .

80. Aska has not sought, and does not plan on seeking, any mental health treatment for any purported issues that arose in connection with the January 11, 2022, occurrence. Ex. A (Aska Dep.), p. 199-200, 206-207. Aska has withdrawn her claim for damages in the form of purported lost wages. Ex. NN (Aska's Supp. Interrogatory Answers), p. 2 ("Plaintiff will not seek damages for loss of income or wages").

**RESPONSE:** Undisputed.

Dated: December 1, 2025

                    Respectfully Submitted,

                    **KIMBERLY ASKA**

            BY: /s/Quinn K. Rallins

               Jon Loevy
               Quinn Rallins
               LOEVY & LOEVY
               311 N. Aberdeen St., 3 rd Fl.
               Chicago, IL 60607
               T: 312-243-5900
               F: 312-243-5902
               rallins@loevy.com

               *Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on December 1, 2025 I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which affected service on all counsel of record.

By: /s/ Quinn K. Rallins

*One of Plaintiff's Attorneys*