## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## WESTERN DIVISION

| | |
|---|---|
| KIMBERLY ASKA, | CASE NO. 3:23-CV-50004 |
| PLAINTIFF, | |
| V. | |
| | HONORABLE IAIN D. JOHNSTON |
| KENNETH YINGLING, ET AL. | |
| DEFENDANTS. | |

### MEMORANDUM OPINION AND ORDER

"Please comply with Rule 56.1. I'm begging you."

This plea by the Court to counsel was unsuccessful. Despite this plea and multiple warnings in this case—and other cases—counsel *still* violated Rule 56.1. Apparently, this Court's prior decisions and standing order are insufficient. So, all counsel are on notice—as if they weren't before—that the failure to comply with Local Rule 56.1 will result in the Court completely striking non-compliant submissions.

\* \* \*

Defendants Kenneth Yingling and Matthew Montemayer have moved for summary judgment [282] on the remaining claims before the Court. For the following reasons, Aska's Rule 56.1 disclosure [290] and response [292] are stricken. The motion for summary judgment is granted as to Counts III, IV, and V and denied as to Counts I and II.

**A Colloquy on Rule 56**

In responding to a motion for summary judgment, a party asserting that a fact is genuinely disputed must support the assertion by "citing to particular parts of materials in the record… or showing that the materials cited [by the opposing party] do not establish the absence… of a genuine dispute…" Fed. R. Civ. P. 56(c).

In the Northern District of Illinois, a party opposing summary judgment shall file and serve a response to the moving party's statement of material facts that "complies with LR 56.1(e)." N.D. Ill. L.R. 56.1(b)(2). Responses "may not assert legal arguments except to make an objection, including objections based on admissibility, materiality, or absence of evidentiary support." N.D. Ill. L.R. 56.1(e)(2). If the opposing party wishes to assert facts not set forth in their opponent's statement, they may file a statement of additional material facts that must "compl[y] with LR 56.1(d)." N.D. Ill. L.R. 56.1(b)(3). This too "should not contain legal argument." N.D. Ill. L.R. 56.1(d)(4).

What's more, in addition to reiterating a party's obligations to follow both the Federal Rules and Local Rules, this Court has emphasized that a respondent's statements "must… be limited to concise, discrete facts." J. Johnston Standing Order on Summary Judgment. "Try to tell a coherent, chronological story with the facts. The statement of facts should not read like a Quentin Tarantino script." *Id.*

Failure to properly support or address a fact permits a court to consider the fact undisputed for purposes of the motion. Fed. R. Civ. P. 56(e)(2). The Seventh Circuit has repeatedly held that the district court is within its discretion to enforce

strict compliance with Local Rule 56.1. *Hanover Ins. Co. v. House Call Physicians of Ill.*, No. 15 C 3684, 2016 U.S. Dist. LEXIS 52279 at *4-5 (N.D. Ill. Apr. 19, 2016) (collecting cases).

*     *     *

Rule 56 exists for a reason. So does Local Rule 56.1. And so does this Court's standing order on summary judgment. Dragnet's fictional Sgt. Joe Friday said it best: "just the facts, ma'am." Jim Feliciano, *Just the Facts: The Enduring Legacy of Dragnet on Radio and Beyond*, USA Radio Museum (July 16, 2025) (https://usaradiomuseum.com/radio-stations/just-the-facts-the-enduring-legacy-of-dragnet-on-radio-and-beyond/) (last accessed Jan. 13, 2026) (noting the line is misquoted).

When a litigant disregards these rules and orders, it makes everything more difficult for everyone. Filings that run afoul of the rules—reading more like long-form op-eds than nonfiction—require its readers to sift through what effectively becomes a second crack at a winning argument. And when a litigant—or a law firm—intentionally and pervasively circumvents the rules time and time again, apparently seeking to obfuscate the record in the hopes that the court will simply throw its hands up in frustration, consequences must follow or the cycle of sordid lawyering will never end.

Aska's Rule 56 response [292] is rife with argumentative, inflammatory, and irrelevant commentary that runs counter to the very essence of what a "disclosure of undisputed facts" should entail. For example:

3

- Defendants' Statement ¶ 1: Plaintiff Kimberly Aska seeks to hold defendants Yingling and Montemayer liable for injuries she allegedly sustained on January 11, 2022, during the course of a law enforcement operation to apprehend fugitive parolee Adam Graham (Graham), Aska's boyfriend, who was living at her residence located in Dekalb, Illinois. (citations omitted).[1]
  - Aska's Response: Disputed in part. In denying Defendants' motion for summary judgment, this Court determined that "whether they acted under color of state (as opposed to federal) law" is a question that "turns on numerous disputed facts" ... Plaintiff seeks to hold Defendants Yingling and Montemayer accountable for violating her constitutional rights based on the orders given by IDOC's Chief of Parole, instructing them to apprehend Graham… Also disputed to the extent that Defendants suggest that Plaintiff did not sustain severe injuries. (citations omitted).

- Defendants' Statement ¶ 8: On January 11, 2022, law enforcement officers including, among others, Montemayer, Yingling, Todd McCloud (McCloud), and USMS Senior Inspector Michael Schulte (Schulte) participated in an operation to locate and apprehend fugitive parolee Graham. (citations omitted).
  - Aska's Response: Disputed to the extent Defendants are referring to any federal task force "operation." In denying Defendants' motion for summary judgment, this Court determined that "whether they acted under color of state (as opposed to federal) law" is a question that "turns on numerous disputed facts"... IDOC's chief of parole ordered Defendant Montemayer to coordinate the apprehension of Graham for transporting drugs into a state facility... He ordered Montemayer because IDOC assigned him as the lead investigator on the case. (citations omitted).

- Defendants' Statement ¶ 11: At the briefing, the officers also discussed possible Dekalb locations where Graham was likely hiding, including Aska's residence. (citations omitted).
  - Aska's Response: Disputed in part. The cited evidence does not contain information that Graham was "hiding." On November 12, 2021, Graham called IDOC to request a transfer of his parole residence to Plaintiff's home, and provided them with her address on Chamberlain Drive in Dekalb, Illinois... *Graham was not hiding*. Defendant Montemayer, the lead investigator, continuously doubted Graham was residing at Aska's home... Defendant Montemayer did not attempt to arrest Graham until January 11, 2022, after the state's chief of parole

---

[1] As an aside, this statement of fact is a fair and accurate statement of the case. Indeed, the Court will likely use it—or something similar—to explain the nature of the case to the jury.

ordered them to find Graham for transporting drugs into a state prison... As the lead investigator, Montemayer is unaware of a single investigative step taken prior to January 11, 2022, to apprehend Graham. (citations omitted) (emphasis added).

- Defendants' Statement ¶ 17: Shortly thereafter, McCloud positively identified Graham, after Graham exited Aska's residence and approached the vehicle Malone had been working on. (citations omitted).
  - Aska's Response: Disputed in part. Defendants Yingling and Montemayer did not know whether McCloud could positively identify Graham. *At best, Montemayer believed that an individual matching Graham's description exited Aska's home*... But since officers were uncertain Graham was the person, they did not apprehend him even though he apparently remained outside for approximately 5 minutes... When Montemayer and Yingling stopped Aska's vehicle, they remained uncertain whether Graham was actually in the house... Later, *as they forced their way into Ms. Aska's home*, they interrogated her to find out whether Graham was in the house... Since Ms. Aska had just woken up, and did not know whether Graham was in the house either, Montemayer and Yingling threatened to send her to prison. (citations omitted) (emphasis added).

- Defendants' Statement ¶ 37: Malone then walked around the side of the house, entered the house, and, at approximately 1:51 p.m., opened the door from within. Upon Malone opening the front door, Aska said, "Thank you, Jesus!" (citations omitted).
  - Aska's Response: Disputed to the extent Defendants *suggest* Ms. Aska consented to officers entering her home. *From the very beginning*, Ms. Aska refused entry into her home... But Defendants Montemayer and Yingling *threatened* her that, if she wouldn't agree to help them, she would be "arrested for impeding [their] investigation". (citations omitted) (emphasis added).

- Defendants' Statement ¶ 43: While exposed at the entrance of the residence, Aska continued to stall and as the situation grew even more dangerous, officers ordered Aska to exit the residence, to which Aska responded, "No." ... While refusing to exit the residence, Aska took a step back further inside of the residence and away from the officers. (citations omitted).
  - Aska's Response: Disputed in part. *Reflective of a lack of exigency*, a "few minutes" transpired at the doorway and there was no threat, emergency, or exigency... Defendant Yingling then *lunged* at Ms. Aska and she shouted her refusal at the top of her lungs. (citations omitted) (emphasis added).

5

- Defendants' Statement ¶ 46: In response, Aska pulled further away into her residence and braced herself from being removed by placing her left hand on the inside wall next to the interior side of the front door... Aska also hooked her left leg around the front door to prevent herself from being removed from the residence. (citations omitted).[2]
  - Aska's Response: Disputed in part. Yingling *rushed* into Ms. Aska's home, *slammed* her against a wall, *pressed* her against a stand, and *grabbed* Aska by her neck and hair… Aska *begged* Montemayer for help. (citations omitted) (emphasis added).

- Defendants' Statement ¶ 47: Aska admitted at her deposition that she resisted law enforcement's attempts to remove her from the residence. (citations omitted).[3]
  - Aska's Response: Disputed in part. Ms. Aska never fought back or attempted to flee during this *brutalization*, … , but tried to shield herself from the *brutalization* by taking a slight step backwards, … , and bracing her foot around the door to prevent her from being *slung* onto the concrete. (citations omitted) (emphasis added).

- Defendants' Statement ¶ 58: While on the front lawn and at approximately 1:53 pm, Yingling placed Aska under arrest… Officer Soderstrom assisted Yingling in Aska's arrest. (citations omitted).
  - Aska's Response: Disputed in part. Once Ms. Aska had been *thrown* to the concrete, Yingling *tackled* Ms. Aska in the snow, and yelled "get on the fucking ground!" … Yingling *applied pressure to Ms. Aska's shoulders, pushed her in the snow, and twisted her arms* ... *Confusingly*, Yingling scolded Aska, "don't fucking come running up on us", although Aska had not approached them in any aggressive manner... Then, for the very first time, Yingling told Ms. Aska that she was "under arrest" for, in his words, "lying to us" …

    There was no reason to believe this was deserved, or that Ms. Aska was any sort of threat to the officers or anyone else; and *the officers knew, any reasonable officer would have known, they had no probable cause to believe she had committed a crime...*

    Montemayer and Yingling *continued to shift their explanation* for using force against: Montemayer claims it was for "her safety", … , but Yingling admits there was no concern for Aska's safety so long as they were present. (citations omitted) (emphasis added).

---

[2] As discussed later, video of the incident exists. The video confirms the accuracy of this statement of fact.
[3] Once again, this statement of fact is a fair and accurate characterization of Aska's admission in her deposition.

This list is not exhaustive. Indeed, nearly every single response that is disputed in any form contains argumentative rhetoric more appropriate for closing arguments before a jury than a statement of facts before summary judgment. What's more, many of the statements of fact are accurate representations of the summary judgment record. Instead of admitting the facts and contesting the inferences to be drawn from these undisputed facts in the memorandum, the responses generally didn't address the *facts* in the statement of facts. Rather, counsel engaged in legal argument, which he and his firm have been repeatedly told violate Rule 56.1.

Aska's Rule 56 disclosure of additional material facts [290] is no better. For example:

- Aska's Statement ¶ 3: Senior Parole Agent Matthew Montemayer was assigned to find Graham and, after reviewing law enforcement databases, public aid transactions, social media posts, and receiving Graham's request to stay with Ms. Aska… he *continuously doubted* Graham was residing at Aska's home." (citations omitted) (emphasis added).

- Aska's Statement ¶ 4: Throughout the entire investigation, Defendants *refused* to go to Ms. Aska's home; instead, they went to multiple other locations where they believed Graham could be found. (citations omitted) (emphasis added).

- Aska's Statement ¶ 5: Defendants *finally* decided to visit Ms. Aska's home after the state's chief of parole ordered them to find Graham for transporting drugs into a state prison. (citations omitted) (emphasis added).

- Aska's Statement ¶ 8: The officers took Ms. Aska back to her home, *which was tranquil*: the officers observed Christmas holiday decorations and did not see or hear anything indicative of violence, noises, disturbances, or threats. (citations omitted) (emphasis added).

- Aska's Statement ¶ 10: *Reflexive of a lack of exigency*, a "few minutes" transpired at the doorway and there was no threat, emergency, or exigency. (citations omitted) (emphasis added).

- Aska's Statement ¶ 11: *At that point, all that happened* was Ms. Aska, with the door open, asked the officers at least five times to "give [her] a second" because she had just woken up, and did not know whether Graham was even in the house. (citations omitted) (emphasis added).

- Aska's Statement ¶ 13: *If somehow Yingling and Montemayer still could not understand* that she did not consent to them coming inside her home, she *shouted her refusal at the top of her lungs*. (citations omitted) (emphasis added).

- Aska's Statement ¶ 17: *In disbelief*, Aska *begged* Montemayer for help. (citations omitted) (emphasis added).

- Aska's Statement ¶ 20: *There is no dispute about what happened next*: Ms. Aska was *slung* from inside her home, into the air, and onto the concrete outside. (citations omitted) (emphasis added).

- Aska's Statement ¶ 22: *Even this was not enough*. Once Ms. Aska had been thrown to the concrete, Yingling tackled Ms. Aska in the snow, and yelled "get on the fucking ground!" (citations omitted) (emphasis added).

- Aska's Statement ¶ 25: *There was no reason to believe this was deserved*, or that Ms. Aska was any sort of threat to the officers or anyone else; and the officers knew, *any reasonable officer would have known*, they had no probable cause to believe she had committed a crime. (citations omitted) (emphasis added).

Again, the list goes on.

Although lawyers may be in some sense innately argumentative, and the Court would be inclined to forgive a one-off slip, Aska—or at the very least her attorneys—should not feign the least bit of surprise at the decision to strike Aska's Rule 56.1 disclosure and response. Neither Mr. Rallins, nor his firm Loevy & Loevy, are strangers to running afoul of Rule 56. They have been warned *repeatedly*, in both this case and others, that their laissez-faire attitude toward Local Rule 56.1 is

inappropriate and may subject their client to this very outcome. For example, in

this case alone, the Court gave the following warnings:

- Dkt. 273 Summary Judgment Pre-filing Conference, held 04/14/2025:

  THE COURT: … And then a word to the wise. Now, it shouldn't be an issue
  on this, but a word to the wise under Local Rule 56.1: I do not want to see a
  statement of fact that goes on for three or four run-on sentences that takes up
  a third of the page. That is not what the rule envisions or anticipates … And
  responses are responsive to that, not additional facts or arguing over
  interpretations of the facts. I'm going to view the facts in the light most
  favorable to the plaintiff. So if they are admitted, they are admitted. And if
  you need to add, you know, Mr. Rallins, if you need to add additional facts,
  that's what Rule 56 is for.

  MR. RALLINS: Yes, Your Honor.

  THE COURT: All right. Because if it is not complied with, I'm going to start
  striking these things because we spend far too much time dealing with fights
  over Rule 56.1, okay?

- Dkt. 260 Minute Entry, entered 06/04/2025: Local Rule 56.1(b)(2) responses
  must "compl[y] with LR 56.1(e)." LR 56.1(e)(1), in turn, says that LR
  56.1(b)(2) responses "must consist of numbered paragraphs corresponding to
  the numbered paragraphs in the LR 56.1(a)(2)." And, [e]ach paragraph shall
  set forth the text of the asserted fact (including its citations to the supporting
  evidentiary material), and then shall set forth the response." Plaintiffs
  56.1(b)(2) response doesn't comply with 56.1(e)(1): It doesn't "set forth the
  text of the asserted fact" and the numbered paragraphs don't match those in
  the LR 56.1(a)(2) filing. [In its discretion, the Court then provided leave to
  refile a compliant response rather than striking this noncompliant Rule 56.1
  statement.]

- Dkt. 269 Memorandum Order, entered 07/07/2025 at *1 n.1: … Though Aska
  departs from L.R. 56.1 on many occasions, those infractions, while
  frustrating, will be forgiven… But going forward, Aska's counsel's firm is on
  notice that future infractions will result in the Court striking the L.R. 56.1
  statement. Violating L.R. 56.1 is a recurring problem with Aska's counsel's
  firm. (citation omitted). And the Court already flagged a previous problem
  with Aska's prior filing of her L.R. 56.1 statement. Dkt. 260. The Court has
  been more than charitable with Aska's counsel's firm's failure to comply with
  the rule.

- Dkt. 270 Summary Judgment Pre-filing Conference, held 08/14/2025:

  THE COURT: … Please comply with with Rule 56.1. I'm begging you. And I think I have already issued one warning in this case and other warnings regarding the Loevy & Loevy firm. Don't do what you normally do. Comply with Rule 56.1.

  As alluded to in the warnings above, this is a chronic affliction within Aska's

firm, Loevy & Loevy, that has plagued this district for over 20 years:

- *Hanania v. Loren-Maltese*, 319 F.Supp.2d 814, 819 (N.D. Ill. 2004): Plaintiffs [represented by Loevy & Loevy] should take better care to avoid argument in their statement of facts—it only frustrates a court's identification of the uncontested facts… [T]he court will disregard any statements that are merely unsupported argument, when reaching its decision on the motions for summary judgment.

- *Harris v. United States*, No. 13-cv-8584, 2017 U.S. Dist. LEXIS 27424 at *3 n.1 (N.D. Ill. Feb. 28, 2017): Plaintiff [represented by Loevy & Loevy] disputed many of the facts in the Government's Statement of Facts and provided lengthy responses to many of them. While many of these responses cite to evidence on the record, they often provide extraneous or argumentative information… [S]ubstantial compliance with Local Rule 56.1 is not enough. To the extent that Plaintiff's responses are not in strict compliance with Local Rule 56.1, the facts that are not properly disputed will be deemed admitted for the purposes of this Motion.

- *Rivera v. Guevara*, 319 F.Supp.3d 1004, 1018 (N.D. Ill. 2018): First, some paragraphs of Rivera's [represented by Loevy & Loevy] Local Rule 56.1 submissions include legal argument and arguments about what inferences should be drawn from facts… The court disregards the portions of the parties' Local Rule 56.1 submissions that make legal arguments and assert legal conclusions, which are not factual statements at all.

- *Pursley v. City of Rockford*, No. 18-cv-50040, 2024 U.S. Dist. LEXIS 42015 at *4 (N.D. Ill. Mar. 11, 2024): This matter is, in short, a mess. The parties presented the Court with 533 pages of Rule 56.1 statements, briefing, and ancillary briefing. In the statements of fact and responses, both parties strayed far from Rule 56.1's requirements. The paragraphs were not short, nor did they 'contain only one or two individual allegations.' (citation omitted). The statements were also not limited to material facts—some were immaterial, and others weren't facts. The list goes on… Rule 56.1 was

intended to simplify the summary judgment process (citiation omitted). That certainly didn't happen in this case.

- *Johnson v. Guevara*, No. 20 C 4156, 2025 U.S. Dist. LEXIS 55033 at *6 (N.D. Ill. Mar. 24, 2025): [T]his Court sternly admonishes Johnson [represented by Loevy & Loevy] for filing his voluminous statement of disputed facts without leave of Court and without due regard to the Court's summary judgment procedures. His filing blatantly subverts the purposes of this Court's summary judgment procedures and egregiously disregards this Court's repeated directions to the parties. The Court warns Johnson that future instances of noncompliance with the Court's procedures will result in sanctions, up to and including, dismissal of this case.

- *Iglesias v. Guevara*, No. 19-cv-6508, 2025 U.S. Dist. LEXIS 223437 at *2-4 (N.D. Ill. Nov. 13, 2025): Defendants are correct in that Iglesias [represented by Loevy & Loevy] 'routinely violates' Local Rule 56 by 'argu[ing] his case and inject[ing] additional facts … that do not materially controvert or respond directly to the corresponding facts or supporting record citations.' … [T]he Court does not believe this is 'just shoddy work,' as Iglesias is represented by experienced counsel [Loevy & Loevy]. *To be frank, [Loevy & Loevy] knows better.* (emphasis added).[4]

To be certain, this is not Aska's fault. It is her attorneys. Unfortunately, Ms. Aska must fall on the sword for her attorney's shortcomings. *Hinterberger v. City of Indianapolis*, 966 F.3d 523, 529 (7th Cir. 2020) (citing *Wade v. Soo Line R.R. Corp*, 500 F.3d 559, 564 (7th Cir. 2007)).

Even if it could, the Court is not required to evaluate each line item of Aska's filing to fish for facts in a sea of argument. *Hinterberger*, 966 F.3d at 529. As a result of Plaintiff's repeat noncompliance with court rules, the responsive pleading to Defendant's Statement of Material Facts [292], as well as the Plaintiff's Statement of Additional Material Facts [290], are stricken in their entirety. The summary judgment motion shall be determined based solely on Defendants'

---

[4] This Court is unsure whether it can take judicial notice of this, but in the undersigned's experience it takes a lot to exasperate Judge Valderrama.

statement of undisputed facts [278].[5] Again, a video recording of the incident exists, so that evidence will control if it conflicts with a parties' representation. *Scott v. Harris*, 550 U.S. 372, 378-81 (2007); *Horton v. Pobjecky*, 883 F.3d 941, 944 (7th Cir. 2018).

## Background

On January 11, 2022, IDOC Senior Parole Agents Kenneth Yingling and Matthew Montemayer were members of a team tasked with executing an arrest warrant on fugitive Adam Graham. Defendant's Statement [278] at ¶¶ 3, 9. At approximately 1:30pm, Yingling and Montemayer conducted a traffic stop of Graham's girlfriend, Kimberly Aska, after being informed that Graham was seen entering her home. *Id.* at ¶¶ 20, 23. With Aska was her cousin, Bryan Malone. *Id.* at ¶¶ 16, 23. During the traffic stop, Aska denied that Graham was in her home and reported that it was another man—her daughter's boyfriend, Travon Jackson—who had been witnessed entering Aska's home. *Id.* at ¶¶ 26-27. Police records reviewed by Defendants at that time reflected that Jackson stood ten inches shorter and 80 pounds lighter than Graham. *Id.* at ¶ 27. Aska agreed to return to her home with the officers. *Id.* at ¶ 28.

Upon returning to Aska's home at approximately 1:43pm, the front door was locked. *Id.* at ¶¶ 31, 35. Malone successfully entered the home "around the side of the house," and opened the front door from within. *Id.* at ¶ 37. Malone exited the

---

[5] This decision relates solely to the instant motion for summary judgment. Fed. R. Civ. P. 56(e)(2). Aska is not foreclosed from re-introducing objections to Defendants' statement of facts in later pleadings or at trial. All filings must conform with all Local Rules or are subject to being stricken.

house and Aska entered, while Defendants remained outside on the front porch. *Id.* at ¶¶ 38, 39.

Aska informed Defendants that she "need[ed] a second" before letting them into the home. *Id.* at ¶ 40. The officers declined to provide her this time and ordered Aska to exit the home. *Id.* at ¶¶ 41-43. Yingling then entered the home and physically removed Aska from the home. *Id.* at ¶ 45. Aska verbally and physically resisted. *Id.* at ¶ 46; Ex. BB. She retreated into the home, yelled, and braced herself on the frame of the door, and then hooked her leg around the front door. *Id.* Montemayer removed Aska's hand from the doorframe to assist Yingling in removing Aska from the home. Defendant's Statement [278] at ¶ 50. In the process of removing Aska from the home, she suffered an injury to her knee. *Id.* at ¶ 52. Aska was placed under arrest but was not criminally charged for any offense related to the events on that day. *Id.* at ¶¶ 58, 64.

Aska's home features an extensive surveillance system with video cameras throughout her residence, including the front porch and living room. *Id.* at ¶ 30. These captured the encounter at the home between Aska and Defendants. *See* Ex. Z, AA-MM, and QQ-VV.

Graham was taken into custody at 3:42pm after a two-hour standoff. Defendant's Statement [278] at ¶ 65. After Graham's surrender, Aska consented to police searching her home and a protective sweep was completed, though neither Yingling nor Montemayer were present at that time. *Id.* at ¶¶ 67, 70. A search warrant for Aska's home was signed at approximately 4:30pm and was executed by

13

Dekalb Police at approximately 5:27pm. *Id.* at ¶ 72. Neither Yingling nor Montemayer were involved in the execution of the search warrant. *Id.* at ¶ 74.

Paramedics treated Aska's knee at the scene and she declined further treatment at that time. *Id.* at ¶ 75. Further testing of her knee revealed no structural damage, and the injury does not interfere with Aska's daily life. *Id.* at ¶¶ 77-79.

Aska's complaint originally brought fourteen sprawling claims against five individuals, the City of Dekalb, and the United States.[6] It has since been reduced to just what is before the Court today: five claims against only two defendants, Yingling and Montemayer. *See* Second Amended Complaint [211]; Dkts. 222, 228, 237, and 250. The five remaining counts, each brought under 18 U.S.C. § 1983, allege excessive force, failure to intervene, deprivation of liberty, unlawful search and seizure, and conspiracy. Second Amended Complaint [211] at ¶¶ 70-82. The Court has previously denied summary judgment on the issue of whether defendants were operating under color of state law. Dkt. 269.

## Analysis

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter

---

[6] Though not as egregious as its Rule 56.1 violations, the Court also takes note that the "kitchen sink" approach, wasting the time of clients, litigants, and the Court alike, is also a common Loevy & Loevy tactic. "[W]hen a valid claim exists—as is the case here—the weak and unnecessary claims distract from and diminish the value of the valid claim." *Pursley v. City of Rockford*, No. 18-cv-50040, 2024 U.S. Dist. LEXIS 42015 at *4 n.1 (N.D. Ill. Mar. 11, 2024); *see also*, *Gurman v. Metro Hous. & Redevelopment Auth.*, 842 F.Supp.2d 1151, 1154 (D. Minn. 2011) ("The bad obscures the good.").

of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if a reasonable jury could return a verdict for the nonmovant, construing the evidence and all reasonable inferences in favor of the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986); *Rickher v. Home Depot, Inc.*, 535 F.3d 661, 664 (7th Cir. 2008). The Court need not draw every conceivable inference in favor of the nonmovant, only reasonable ones. *Moser v. Ind. Dep't of Corr.*, 406 F.3d 895, 905 (7th Cir. 2005).

### i. *Count I: Excessive Force*

The Fourth Amendment prohibits the use of excessive force during an arrest. U.S. Const. amend. IV; *Graham v. Connor*, 490 U.S. 386, 394-95 (1989). "An officer's use of force is unreasonable if, judging from the totality of the circumstances at the time of the arrest, the officer uses greater force than was reasonably necessary to effectuate the arrest." *Phillips v. Cmty. Ins. Corp.*, 678 F.3d 513, 519 (7th Cir. 2012).

Though not impossible, summary judgment is generally incompatible with claims of excessive force. *See Cyrus v. Town of Mukonago*, 624 F.3d 856, 862 (7th Cir. 2010). "When material facts are in dispute, then the case must go to a jury, whether the argument is that the police acted unreasonably because they lacked probable cause, or that they acted unreasonably because they responded overzealously and with too little concern for safety." *Bell v. Irwin*, 321 F.3d 637, 640 (7th Cir. 2003).

To succeed, Yingling and Montemayer must effectively demonstrate that their force was *so* objectively reasonable that no reasonable jury could find

15

otherwise. Reasonableness is a quintessential question for the jury. *Becker v. City of Evansville*, No. 12-CV-182, 2015 U.S. Dist. LEXIS 8414 (S.D. Ind. Jan. 26, 2015). Even based solely on Defendants' Statement of Facts, Defendants have failed to overcome that significant hurdle of reasonableness, and so their motion must fail as to the excessive force count.

It's not necessary to evaluate every moment of the encounter between Aska, Yingling, and Montemayer to come to this conclusion. It is sufficient to say that Defendants' reasonableness is a disputed material question of fact. Aska will argue that the totality of the circumstances—including officers permitting Malone to apparently enter the home through a window just before claiming safety required Aska's removal from the home—demonstrates that aggressive, overzealous, and assaultive police officers forcibly ejected her from her own home. Yingling and Montemayer will argue that the totality of the circumstances—including Aska lying repeatedly to them about a violent felon's whereabouts—constituted a dangerous and volatile situation during which they used force appropriately. Whether the actions were reasonable is for a jury to decide based on its factual findings.

Qualified immunity fails to shield Defendants from this claim. Although it's true that qualified immunity provides "ample protection to all but the plainly incompetent or those who knowingly violate the law," it is clearly established that use of excessive force during an arrest is a constitutional violation. *Malley v. Briggs*, 475 U.S. 335, 341 (1986); *Holmes v. Vill. of Hoffman Estate*, 511 F.3d 673, 687 (7th Cir. 2007). Construing the facts in a light most favorable to Aska, no reasonable

16

officer could have believed throwing a non-resisting—or passively resisting—subject onto her concrete stoop, causing injury, was reasonable.[7]

### ii.    Count II: Failure to Intervene

A police officer who is present and fails to intervene to prevent another officer from infringing the constitutional rights of a citizen is liable under § 1983 if that officer had reason to know: "(1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994) (citations omitted).

Because the question of excessive force requires a jury, all that is left to decide for this motion is whether Montemayer had a "realistic opportunity" to intervene as a matter of law. This too is a material question of fact reserved for determination by the jury.

A realistic opportunity to intervene may exist whenever an officer could have "called for a backup, called for help, or at least cautioned [the excessive force defendant] to stop." *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang*, 37 F.3d at 285). "Whether an officer had sufficient time to intervene or was capable of preventing the harm caused by the other officer is generally an issue for the trier of fact unless, considering all the evidence, a reasonable jury

---

[7] Of course, at trial, Aska will not receive the benefit of facts being viewed in the light most favorable to her, nor inferences drawn in her favor. Indeed, Aska will bear the burden of proof to establish by a preponderance of the evidence that the actions were not reasonable. Her failure to do so will undoubtably result in a motion for bill of costs from Defendants.

*could not possibly conclude otherwise.*" *Abdullahi*, 423 F.3d at 774 (quoting *Lanigan v. Vill. of E. Hazel Crest, Ill.*, 110 F.3d 467, 478 (7th Cir. 1997)).

Here, the incident did happen quickly. One moment, Aska was entering her home. The next, Yingling was physically removing her from her home. But the incident didn't happen *so* quickly that Montemayer was merely standing by idly. Indeed, he "removed Aska's hand from the doorframe of the residence so that Aska could be removed from the residence…" and physically touched Aska himself for as long as five seconds. Defendant's Statement [278] at ¶¶ 50, 55.

There is no one-size-fits-all approach for deciding how much time is sufficient to establish a realistic opportunity to intervene. *Compare Xie v. City of Chicago*, No. 14-CV-6082, U.S. Dist. LEXIS 146636 at *12 (N.D. Ill. Oct. 24, 2016) (no realistic opportunity to intervene existed when defendant had a mere two-second window to intervene), *with Morris v. City of Chicago*, No. 07 C 3409, 2010 U.S. Dist. LEXIS 68419 at *3-4 (N.D. Ill. July 7, 2010) (summary judgment inappropriate when a three to five-second break between sets of gunshots may reasonably have provided an opportunity to intervene). Because five seconds might have been enough time for Montemayer to intervene, it is appropriate for a jury to decide the issue.

### iii.    *Count III: Deprivation of Liberty*

Two potential claims for deprivation of liberty arose out of the events in question: one when the Defendants executed an investigative detention (more commonly known as a "*Terry* stop") on Aska's vehicle, and the other when

18

Defendants formally arrested Aska after removing her from the home.[8] Summary judgment in favor of Defendants is appropriate on both claims.

As a preliminary matter, although the complaint argues that the *Terry* stop and ultimate arrest were violations of Aska's Fourth and Fourteenth Amendment rights, only the former provides recourse for unlawful pretrial detention. Second Amended Complaint [211] at ¶ 80; *Manuel v. City of Joliet, Ill.*, 580 U.S. 357, 368-70 (2017); *Young v. City of Chicago*, 987 F.3d 641, 645 (7th Cir. 2021). To the extent Aska seeks redress through the Due Process Clause, summary judgment is granted.

Turning to the substantive claims through the lens of the Fourth Amendment, Aska doesn't address the *Terry* stop in her response to the motion for summary judgment, and thus abandons any argument related to that potential deprivation of liberty. *Robertson v. Dep't of Health Servs.*, 949 F.3d 371, 374 n.2 (7th Cir. 2020) (citing *Palmer v. Marion Cty.*, 327 F.3d 588, 597 (7th Cir. 2003)).[9] Frustratingly, Aska has abandoned this claim despite her counsel's explicit representation to the Court at the pre-filing conference that no claims would be abandoned. One of the many purposes of the Court's pre-filing conference is to remove from consideration claims that will not be pursued. *See* Fed. R. Civ. P. 16(c)(2)(A). Similar abandonment of claims during summary judgment briefing after refusing to timely abandon those claims when specifically asked by the Court will

---

[8] To the extent Aska may further argue in Count IV that she was unlawfully seized in her person by her arrest, this analysis controls.

[9] Even had it not been abandoned, the 13 minutes that elapsed between Aska leaving her home and Aska returning to her home with Defendants is very likely insufficient to create a *de facto* arrest within the *Terry* stop. *See United States v. Bullock*, 632 F.3d 1004, 1015 (7th Cir. 2011).

result in sanctions. This type of behavior is either evidence of being completely unprepared at the pre-filing conference, lazy lawyering, or simply bad faith.

The remaining claim—for the arrest itself—was made with probable cause, or at least arguable probable cause, as a matter of law. So, any claim for a deprivation of liberty related to the arrest must fail. *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006).[10]

Probable cause to justify an arrest exists if the totality of the facts and circumstances known to the officer at the time of the arrest would cause a reasonable person to believe that the arrestee had committed a crime. *Holloway v. City of Milwaukee*, 43 F.4th 760, 769 (7th Cir. 2022) (citing *Beck v. Ohio*, 379 U.S. 89, 96 (1964)). "Reasonableness requires an objective inquiry into all of the circumstances known to the officer at the time that he detained the suspect." *Huff v. Reichert*, 744 F.3d 999, 1004 (7th Cir. 2014) (citing *United States v. Snow*, 656 F.3d 498, 500 (7th Cir. 2011)). Subjective intentions play no role in ordinary probable cause analysis. *Wren v. United States*, 517 U.S. 806 (1996). Probable cause requires that the officer's belief be reasonable, not that it be correct. *Huff*, 744 F.3d at 1007 (citing *Qian v. Kautz*, 168 F.3d 949, 953 (7th Cir. 1999)).

Qualified immunity—often termed "arguable probable cause" in this context—provides an additional layer of protection to Defendants, as even an officer

---

[10] A finding that an arrest was made with probable cause doesn't foreclose the possibility that the arrest was made with excessive force. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 724 (7th Cir. 2013) ("[T]he reasonableness of an arrest… depends not only on *when* it is made but also on *how* it was made") (internal citation omitted). The analysis related to Count III does not change the analysis above regarding Count I.

who reasonably but mistakenly believes that probable cause exists is shielded from liability. *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012).

Defendants argue that at least three statutes provided them with probable cause to arrest Aska: 720 ILCS 5/31-5(a) (concealing or aiding a fugitive), 720 ILCS 5/31-1 (resisting or obstructing a peace officer), and 720 ILCS 5/31-4 (obstructing justice). Defendants' Motion for Summary Judgment [282] at 14-15. Because the Court finds that probable cause, or at least arguable probable cause, existed as a matter of law for Yingling and Montemayer to arrest Aska for concealing or aiding a fugitive, the Court will not explore other statutes that may have also provided probable cause.

In Illinois, it is a crime to conceal or aid a fugitive, defined as:

> Every person not standing in the relation of husband, wife, child, brother or sister to the offender, who, with intent to prevent the apprehension of the offender, conceals his knowledge that an offense has been committed or harbors, aids, or conceals the offender, commits a Class 4 felony.

720 ILCS 5-31-5(a)

Here, by the time the arrest was initiated, Defendants had the following information: Graham was Aska's boyfriend; another officer witnessed Graham exiting and entering Aska's household; after officers told Aska they had an arrest warrant for Graham, Aska had told officers that they had seen a different man, Trevon Jackson; police records indicated Jackson was significantly smaller in stature than Graham; Aska agreed to return to her home with officers; then Aska abruptly reported needing "a second" before allowing officers entry. Defendant's Statement [278] at ¶¶ 1, 17-19, 26-28, 40.

21

The totality of the circumstances supported officers placing Aska under arrest for concealing or aiding a fugitive. No reasonable jury could find based on these facts that Defendants lacked probable cause in effectuating this arrest. Defendants knew Graham was inside the residence; Defendants knew Aska was lying to them about Graham being in the residence; Aska attempted to mislead Defendants by claiming it was Jackson inside her home; and Aska sought time alone in the home with Graham. As a matter of law, a reasonable person must believe that Aska had committed the crime of harboring or aiding a fugitive at the time of her arrest. *Holloway*, 43 F.4th at 769; *Beck*, 379 U.S. at 96.

Even notwithstanding probable cause, there is no doubt that arguable probable cause existed, shielding Defendants from liability for the arrest. A reasonable officer in the same circumstances and possessing the same knowledge as Yingling and Montemayer could certainly have reasonably believed that probable cause existed in light of well-established law. *Huff*, 744 F.3d at 1007. So, they are immune from suit regarding the arrest.

Evaluating the undisputed facts in a light most favorable to Aska, she was not the violent felon that Graham was. Nonetheless, her actions subjected her to a lawful arrest for at least the crime of harboring or aiding a fugitive. Summary judgment in favor of Defendants is granted as to Count III.

iv.  *Count IV: Unlawful Search and Seizure*

As with Count III, two potential claims for unlawful search and seizure arose out of the events in question: one when the Defendants entered Aska's home to

22

arrest her, and the other when officers executed a protective sweep of Aska's home in the time between Graham's arrest and the issuance of a search warrant.

Addressing first the protective sweep, summary judgment is appropriate. Yingling and Montemayer didn't participate in the protective sweep of Aska's home. So, they can't be held liable for the search, whether it was a lawful protective sweep, a lawful search by consent, or an unconstitutional search. Defendant's Statement [278] at ¶ 70. Although warrantless searches of a home are presumptively unreasonable, only those officers who personally search the home may be held liable. *Gaetjens v. City of Loves Park*, 4 F.4th 487, 491 (7th Cir. 2021) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)); *see also, Swanigan v. Trotter*, 645 F.Supp.2d 656, 678 (N.D. Ill. 2009) (summary judgment appropriate when parties were not personally involved in the alleged unreasonable search).

The act of the officers entering the threshold of the home is a closer call. One material question of fact would ordinarily preclude summary judgment: did Defendant Officers believe Graham *lived* in Aska's home or just that he was *present* in Aska's home? Either way, qualified immunity shields Defendants from liability for their entry under these circumstances.

It bears repeating that warrantless searches are presumptively unreasonable. *Gaetjens*, 4 F.4th at 491; *Katz*, 389 U.S. at 357. The home is "first among equals" when it comes to the Fourth Amendment. *Florida v. Jardines*, 569 U.S. 1, 6 (2013). But, of course, exceptions apply. Police officers may enter a home without a warrant in exigent circumstances, including situations presenting a

23

"compelling need for official action and no time to secure a warrant." *Lange v. California*, 594 U.S. 295, 301 (2021) (quoting *Riley v. California*, 573 U.S. 373, 382 (2014)). Police may also enter with the voluntary consent of the homeowner or an authorized individual. *United States v. Richards*, 741 F.3d 843, 847 (7th Cir. 2014) (quoting *United States v. Duran*, 957 F.2d 499, 501 (7th Cir. 1992)). An exception is required even with the foregoing finding that probable cause existed to arrest Aska. *Welsh v. Wisconsin*, 466 U.S. 740, 749-50 (1984). Neither exigency nor consent are applicable in the instant case. Defendant's Reply [302] at 13 n.12.

Defendants argue their entry to the home was permissible nonetheless, due to the valid arrest warrant for Graham. Defendants' Motion for Summary Judgment [282] at 10-12. Generally, law enforcement is prohibited from entering a third-party's home to effectuate an arrest warrant without first obtaining a search warrant. *Steagald v. United States*, 451 U.S. 204, 214-16 (1981). "[A]n arrest warrant does not give police carte blanche to enter any dwelling in search of the object of the warrant." *United States v. Williams*, 79 F.Supp.3d 888, 895 (S.D. Ill. 2015) (quoting *Mascorro v. Billings*, 656 F.3d 1198, 1205 (10th Cir. 2011)). However, when officers have "reason to believe" that the subject of their arrest warrant is currently in the home where the suspect lives, there is an implicit authority within the arrest warrant to enter the home. *United States v. Jackson*, 576 F.3d 465, 467-68 (7th Cir. 2009) (citing *Payton v. New York*, 445 U.S. 573, 602 (1980)). Only if officers are "sufficiently certain" that the subject *lives* in the home may they enter. *Covington v. Smith*, 259 Fed.Appx. 871, 873 (7th Cir. 2008).

24

The Seventh Circuit has not yet entered the fray in defining what amount of "certainty" is "sufficient." *Id*. In the Second, Eighth, Tenth, Eleventh, and DC Circuits, merely holding a reasonable belief (less than that required of probable cause) is "sufficient." *See, e.g., United States v. Lovelock*, 170 F.3d 339, 343 (2d Cir. 1999); *United States v. Risse*, 83 F.3d 212, 216 (8th Cir. 1996); *Valdez v. McPheters*, 172 F.3d 1220, 1224-25 (10th Cir. 1999); *United States v. Bervaldi*, 226 F.3d 1256, 1263 (11th Cir. 2000); *United States v. Thomas*, 423 F.3d 282, 286 (D.C. Cir. 2005). On the other hand, in the Third and Ninth Circuits, probable cause is required. *See, e.g., United States v. Vasquez-Algarin*, 821 F.3d 467, 477 (3d Cir. 2016); *Motley v. Parks*, 432 F.3d 1072, 1079 (9th Cir. 2005).

One would think that if a split of authority exists, public officials would be entitled to qualified immunity. Indeed, the Seventh Circuit believes that a split of authority indicates that the law is not clearly established. *Upton v. Thompson*, 930 F.2d 1209, 1217 (7th Cir. 1991). But, strangely, there's a split of authority on whether a split of authority provides for qualified immunity. *Compare Mocek v. City of Albuquerque,* 813 F.3d 912, 929 n.9 (10th Cir. 2015) ("A circuit split will not satisfy the clearly established prong of qualified immunity.") *with Williams v. Bitner*, 455 F.3d 186, 193 n.8 (3d Cir. 2006) ("Even if our sister circuits had in fact split on the issue, we would not necessarily be prevented from finding that the right was clearly established."). This Court believes the better view—and the one more consistent with Seventh Circuit law, *see Upton*, 930 F.2d at 1217—is that a split of authority provides for qualified immunity. *See Rogers v. Pendleton*, 249 F.3d 279,

287-88 (4th Cir. 2001) ("[I]f other appellate federal courts have split on the question of whether an asserted right exists, the right cannot be clearly established for qualified immunity purposes."). If appellate judges sitting in quiet chambers can't agree on the law, why should an officer know what law is clearly established while making split-second decisions on the street?[11]

But without deciding whether a split-of-authority shortcut establishing qualified immunity exists, Defendants argue that the body of investigation available to them at the time of entry gave them reason to believe both that Graham was living in Aska's house, and that he was in the house at their time of entry. Defendants' Motion for Summary Judgment [282] at 10-12. Unsurprisingly, Aska disagrees. Plaintiff's Response [289] at 4-5. Without rehashing the entirety of this matter's first order on summary judgment, much is in dispute regarding how and why police came to be monitoring Aska's house. More than six weeks had elapsed between the signing of Graham's arrest warrant and the operation which led to both his arrest and this instant case. If officers were sufficiently certain that Graham resided in Aska's house prior to January 11, 2022, it would stand to reason that they would have sooner interviewed Aska about his whereabouts and/or monitored her house.

---

[11] There's a lot to not like about the doctrine of qualified immunity and its application and attempted application. *See, e.g., Hughes v. Garcia*, 100 F.4th 611, 614 (5th Cir. 2024); *Zadeh v. Robinson*, 928 F.3d 457, 474 (5th Cir. 2019) (Willett, J., dissenting). But until Congress acts or the Supreme Court overrules it prior decisions, federal courts should apply the doctrine and its rationale, not find ways to avoid it.

At the same time, observing Graham exiting and re-entering Aska's home the morning of his arrest, combined with evidence collected to that point, strongly suggested he was spending time at Aska's that may have exceeded that of a mere visitor. It is a close call even notwithstanding the split of authority amongst the Circuits regarding the level of scrutiny required. It is also not a decision the Court needs to make today.

As a matter of law, it is not clearly established that entry to a third-party's home to remove that third-party—while armed with an arrest warrant for a violent felon known to be inside the home—is unconstitutional, when probable cause has established that the third party is aiding the subject of the arrest warrant.

For Aska to clear the hurdle of qualified immunity, she must demonstrate that "every reasonable official" would have understood that Defendants' actions violated the Fourth Amendment. *Mullenix v. Luna*, 577 U.S. 7, 11 (2015). She has failed to do so. Aska cites to *Lovi v. Vill. of Arlington Heights*, 62 F.Supp.3d 756 at 767 (N.D. Ill. 2014) in her response. But this case ostensibly relates not to the Defendants' entry, but rather to the later protective sweep. No case cited by Aska— or found by the Court for that matter—is on point to the uniquely nuanced matter that this case presents. Certainly not every reasonable officer would be on notice to the Defendants' actions being a constitutional violation. So, Defendants are immune from suit regarding their entry to the home.

v.    *Count V: Conspiracy*

Finally, summary judgment is appropriate for the count of conspiracy. A civil conspiracy is "a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means." *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015) (quoting *Scherer v. Balkema*, 840 F.2d 437, 441 (7th Cir. 1988)) "To establish conspiracy liability in a § 1983 claim, the plaintiff must show that (1) the individuals reached an agreement to deprive him of his constitutional rights, and (2) overt acts in furtherance actually deprived him of those rights." *Beaman*, 776 F.3d at 510.

Aska must allege that Defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding[,]" and support such allegations with facts suggesting a "'meeting of the minds.'" *Thurman v. Vill. of Hazel Crest*, 570 F.Supp.2d 1019, 1029 (N.D. Ill. 2008) (quoting *Amundsen v. Chicago Park Dist.*, 218 F.3d 712, 718 (7th Cir. 2000)).

Here, Aska falls well short of that requisite threshold. Rather than arguing that Defendants conspired to use excessive force against her—or even to falsely arrest her or search her home—she instead points as her only evidence to the directive of the IDOC Chief of Parole to "get [Graham] off the streets." Plaintiff's Response [289] at 20. Executing an arrest warrant—on a violent felon who has cut his tether and absconded parole, no less—is not a civil conspiracy, it's just policework. And, regardless, Graham is not the plaintiff, Aska is. There's no

evidence, direct or circumstantial, of an agreement to commit unconstitutional actions against Aska.

As there is no genuine dispute as to the elements of conspiracy, summary judgment in favor of Defendants is appropriate.

**Conclusion**

For the above reasons, the motion for summary judgment [282] is granted in part and denied in part. Counts III, IV, and V are dismissed. Counts I and II shall proceed.

Entered: January 22, 2026

By: _____

Iain D. Johnston
U.S. District Judge

29